**TEXAS PARKS AND WILDLIFE DEPARTMENT, Petitioner,**

v.

**The SAWYER TRUST, Respondent.**

**No. 07–0945.**

Supreme Court of Texas.

Argued Nov. 19, 2009.

Decided Aug. 26, 2011.

---

Greg W. Abbott, Attorney General of Texas, Kent C. Sullivan, 14th Court of Appeals, Jeffrey L. Rose, Attorney General of Texas, Karen Watson Kornell, Office of the Attorney General of Texas, Liz Bills, David Preister, Office of the Attorney General, Kristofer S. Monson, Assistant Solicitor General, Austin, TX, for Texas Parks and Wildlife Department.

Jody G. Sheets, Law Office of Jody Sheets, Dallas, TX, for The Sawyer Trust.

William F. Warnick, Texas General Land Office, Austin, TX, for Amicus Curiae Texas General Land Office.

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN joined.

This appeal involves the issue of whether the trial court had jurisdiction over a claim against the Texas Parks and Wildlife Department to determine whether the Salt Fork of the Red River is navigable. The Sawyer Trust sued the Department for a declaratory judgment that the river is not navigable and that the Trust owns the riverbed where it crosses the Trust's property in Donley County. The Department filed a plea to the jurisdiction based on sovereign immunity. After the Department took the position that the river was navigable—and the State therefore owned the riverbed—the Trust added a constitutional takings claim. The trial court denied the Department's plea and the court of appeals affirmed.

We hold that the Trust's claims for a declaratory judgment are barred by sovereign immunity and the Trust cannot assert a takings claim under these circumstances. We also hold, however, that the Trust is entitled to replead and attempt to assert an ultra vires claim against state officials if it chooses to do so. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

## I. Background

The State of Texas owns the soil underlying navigable streams.[1] TEX. PARKS & WILD.CODE § 1.011(c); TEX. WATER CODE § 11.021; see Maufrais v. State, 142 Tex. 559, 180 S.W.2d 144, 148 (1944); State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065,

---

1. Subject to specified limitations, title to certain streambeds has been transferred by the State. See TEX.REV.CIV. STAT. art. 5414a–1. The State and the Trust contend their respective rights to the sand and gravel in the bed of the Salt Fork turn on the issue of navigability. We assume, without deciding, that their positions are correct.

1069 (1932). By statute, a "navigable stream" is "a stream which retains an average width of 30 feet from the mouth up." Tex. Nat. Res.Code § 21.001(3). The taking of sand and gravel from state-owned waters and beds, including those of navigable streams, is regulated by the Department. Tex. Parks & Wild.Code § 1.011(d); Tex. Nat. Res.Code § 51.291; 31 Tex. Admin. Code § 69.101.

The Salt Fork of the Red River crosses property in Donley County owned by the Sawyer Trust. The Trust had an opportunity to sell sand and gravel from the streambed but was concerned that the Department would seek control of the property and interfere with the sale. *See* Tex. Parks & Wild.Code § 86.002(a); 31 Tex. Admin. Code §§ 69.104, 69.114(a). The Trust sued the Department[2] for a declaratory judgment that the Salt Fork was not navigable.[3] The Department filed a plea to the jurisdiction. It asserted that (1) the Trust had not pled a claim that fell within a waiver of sovereign immunity, and (2) the Trust's claims were not ripe because the Department had neither taken action contrary to the Trust's interests nor manifested any intent to do so.

Pursuant to agreement of the parties, and at the urging of the trial court, a surveyor from the General Land Office visited the streambed on the Trust property. He then filed a letter with the trial court setting out that his visit was "for the purpose of determining if the stream was statutorily navigable." He concluded that the Salt Fork was navigable at the point where he measured it on the Trust's property. The Trust then amended its pleadings and added an allegation that the State's claim of navigability constituted a taking of its property under the federal and Texas Constitutions. The trial court denied the Department's plea to the jurisdiction.

The court of appeals affirmed. It held that a declaratory judgment action seeking the determination of a disputed fact issue—the navigability of the stream—is not a suit against the State that implicates sovereign immunity. 354 S.W.3d 489. The court of appeals concluded that although the declaratory action "may have the collateral consequence of resolving a factual dispute that impacts a claim being made by the State, it is not an action that is in essence one for the recovery of money from the State or for determination of title; therefore, legislative permission to prosecute is unnecessary." *Id.* at 490.

The Department no longer urges its ripeness challenge to the Trust's claim: it maintains that the Salt Fork is navigable. Nevertheless, the Department asserts that sovereign immunity deprived the trial court of jurisdiction because (1) there is no general right to sue a State entity for a declaration of rights—such relief is available only in an ultra vires claim against a state official; (2) determination of whether a stream is navigable constitutes a determination of the State's title to property and sovereign immunity bars a suit that would have such an effect; and (3) the Trust's pleadings fail to state a constitutional takings claim. The Trust counters that the trial court had jurisdiction because the suit is (1) a permissible declaratory judgment action under the Texas Constitution; (2) an authorized declaratory judgment action to determine a boundary line as opposed to a trespass to try title suit to determine ownership rights; and (3) a constitutional takings claim because

---

2. The Trust also sued, but then non-suited, the Texas Commission on Environmental Quality.

3. The Trust also sued for injunctive relief. The parties do not address that claim and neither do we.

the State has destroyed value and use of the Trust's property. Alternatively, the Trust argues that if this suit involves an ultra vires claim that it should have brought against a governmental actor, we should remand the case with instructions to modify the parties.

## II. Discussion

### A. Standard of Review

Whether a trial court has jurisdiction is a question of law subject to de novo review. *See Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002).

Generally, sovereign immunity deprives a trial court of jurisdiction over a lawsuit in which a party has sued the State or a state agency unless the Legislature has consented to suit. *See, e.g., Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex.2004). But when the State or a state agency has taken a person's property for public use, the State's consent to suit is not required; the Constitution grants the person consent to a suit for compensation. *See, e.g., State v. Holland*, 221 S.W.3d 639, 643 (Tex.2007); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex.1980).

### B. Declaratory Relief

The Declaratory Judgments Act (DJA) generally permits a person who is interested in a deed, or whose rights, status, or other legal relations are affected by a statute, to obtain a declaration of rights, status, or other legal relations thereunder. TEX. CIV. PRAC. & REM.CODE § 37.004(a). The Department urges, however, that there is no general right to sue a state agency for a declaration of rights. We agree.

### 1. Actions Against State Entities

While the DJA waives sovereign immunity for certain claims, it is not a general waiver of sovereign immunity. *See id.* § 37.006(b); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n. 6 (Tex. 2009) (noting that the DJA waives immunity for claims challenging the validity of ordinances or statutes); *IT–Davy*, 74 S.W.3d at 855–56. But generally, the DJA does not alter a trial court's jurisdiction. *IT–Davy*, 74 S.W.3d at 855. Rather, the DJA is "merely a procedural device for deciding cases already within a court's jurisdiction." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). And a litigant's couching its requested relief in terms of declaratory relief does not alter the underlying nature of the suit. *Heinrich*, 284 S.W.3d at 370–71; *IT–Davy*, 74 S.W.3d at 855. Consequently, sovereign immunity will bar an otherwise proper DJA claim that has the effect of establishing a right to relief against the State for which the Legislature has not waived sovereign immunity. *See City of Houston v. Williams*, 216 S.W.3d 827, 828–29 (Tex.2007) (per curiam).

The Trust argues that sovereign immunity does not apply because the Department acted outside its legal authority when it asserted the Salt Fork was navigable and the State owned the streambed. We disagree—the Department is immune from suit.

The rule remains as it was set out in *State v. Lain:*

> When in this state the sovereign is made a party defendant to a suit for land, without legislative consent, its plea to the jurisdiction of the court based on sovereign immunity should be sustained....

162 Tex. 549, 349 S.W.2d 579, 582 (1961). Neither *Heinrich* nor the DJA creates an exception to a state agency's immunity in

suits for title to land. *See Heinrich,* 284 S.W.3d at 370–73. If the Trust's suit against the Department is in substance a trespass to try title action, it is barred by sovereign immunity absent the Legislature's having waived its immunity. *See Lain,* 349 S.W.2d at 582.

### 2. Contesting Title with the State

Generally, a trespass to try title claim is the exclusive method in Texas for adjudicating disputed claims of title to real property. *See* TEX. PROP.CODE § 22.001(a) ("A trespass to try title action is the method of determining title to lands, tenements, or other real property."); *Martin v. Amerman,* 133 S.W.3d 262, 267 (Tex.2004). "Real property" generally includes the sand and gravel on a tract of land, *see, e.g., Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 102 (Tex.1984), and in this case the Department does not claim otherwise.

In 2007, the Texas Legislature added an exception to the rule that a trespass to try title claim is the exclusive method for adjudicating disputed claims of title to real property. Section 37.004(c) of the Texas Civil Practice and Remedies Code provides that, notwithstanding the trespass to try title statute, a person interested under a deed, will, written contract, or other writings constituting a contract may obtain a determination of title based on a property boundary line "when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties." TEX. CIV. PRAC. & REM.CODE § 37.004(c); *see* TEX. PROP.CODE § 22.001(a). The Trust argues that the claims in this case constitute a boundary dispute and that "new section 37.004(c) can easily and logically be construed as a legislative waiver of any sovereign immunity that has ever in the past impeded private titleholders' efforts to litigate their boundary disputes against the State." We disagree that the claims here constitute a boundary dispute.

The central test for determining jurisdiction is whether the "real substance" of the plaintiff's claims falls within the scope of a waiver of immunity from suit. *See, e.g., Dallas County Mental Health & Retardation v. Bossley,* 968 S.W.2d 339, 343–44 (Tex.1998). The real substance of the Trust's pleadings, evidence, and arguments is that the Salt Fork is not navigable and the State has no ownership rights in its bed. Its allegations are summarized in its live pleading in the section entitled "Causes of Action Against Defendants":

> Defendants' claim of ownership and attempts to enter the property to limit or control Landowner's activities, and that of third parties, *by asserting rights of ownership and the right to control, regulate or prohibit the removal of sand and gravel* constitute an improper claim to and use of the property by Defendants and unreasonably interfere with the Landowner's rights to use and enjoy its property. (emphasis added)

Under the "Relief Sought" section of its pleadings, the Trust sought a declaratory judgment that no navigable stream is present on its property, despite the Department's contention to the contrary, and injunctive relief precluding the Department from entering the Trust's property in an attempt to limit, control, or interfere with the removal of sand and gravel from the Trust's property.

We need not decide whether section 37.004(c) effects a waiver of the State's immunity from suit for boundary disputes because this controversy is not over the boundary between State-owned land and Trust-owned land; rather it is over whether the State owns any land at all. The case involves rival claims to ownership of the entire streambed. Consequently, the Trust's suit in substance is one to deter-

mine title to land. Such a suit against the State is barred by sovereign immunity absent legislative consent. *See Dallas Area Rapid Transit v. Whitley,* 104 S.W.3d 540, 542 (Tex.2003); *Lain,* 349 S.W.2d at 582.

The Trust also urges that it may maintain its suit against the Department because whether a stream is navigable is a judicial determination. It cites to *State v. Bradford,* in which this Court stated,

> The public policy of this state with respect to navigable streams long has been established and enforced, and it is not a question left to the discretion and judgment of ministerial officers. Under the law, those officers were and are not clothed with the power to settle questions of navigability of streams, but, in view of the very nature and importance of the matter, for obvious reasons, it is a question for judicial determination.

121 Tex. 515, 50 S.W.2d 1065, 1070 (1932) (citations omitted). We agree with the Trust that the issue is one for judicial determination. But as we discuss later in greater detail, such a claim is an ultra vires one that must be brought against a governmental official and not the State.

Here the Department, as a defendant, has asserted its sovereign immunity and the Trust has not shown any exceptions to or waiver of it. While courts may determine questions of navigability when they have jurisdiction, a navigability dispute does not comprise an exception to or waiver of sovereign immunity and vest jurisdiction in the courts when the State or a state agency is sued.

In sum, notwithstanding the manner in which they are pleaded, the Trust's claims for declaratory relief are claims against the Department to determine title to the bed of the Salt Fork and are barred by sovereign immunity. *See Lain,* 349 S.W.2d at 582.

## C. Takings Claim

### 1. Analysis

■ The Trust also asserts that a waiver of immunity is not required because this is a suit based on a constitutional taking. The Trust argues that a taking has occurred because the Department's claim of ownership unreasonably interferes with the Trust's rights to use and enjoy its property. The Department urges that the Trust's claim is not a valid takings claim because the Trust seeks only declaratory and injunctive relief based on the dispute over title to the bed of the Salt Fork—a dispute that will be determined by whether the Salt Fork is navigable—but which is nothing more than a title dispute nonetheless.

We agree with the Department. Although the Trust referenced the United States and Texas Constitutions, it did not assert a valid takings claim giving the trial court jurisdiction over its claim.

■ The Texas Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. Likewise, the United States Constitution provides "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Sovereign immunity does not shield the State from claims based on unconstitutional takings of property. *See, e.g., Holland,* 221 S.W.3d at 643; *Steele,* 603 S.W.2d at 791. Whether the government's actions are sufficient to constitute a taking is a question of law. *E.g., Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001).

■ To establish a takings claim, the claimant must seek compensation because

the defendant intentionally performed actions that resulted in taking, damaging, or destroying property for public use without the owner's consent. *See id.* Whether a taking has occurred depends largely on definitional and conceptual issues. *See* 2A JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 6.01[1] (3d ed.2006).

The premise for a constitutional takings cause of action is that one person should not have to absorb the cost of his property being put to a public use unless he consents. *See Steele,* 603 S.W.2d at 789. In contrast to a trespass to try title claim, which quiets title and the right of possession to property, a successful takings claim entitles a claimant to compensation, not to possession of the property. *See* TEX. CONST. art. I, § 17 ("No person's property shall be taken ... *without adequate compensation* being made ....") (emphasis added); *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995) (stating that section 17 of the Texas Constitution waives immunity only when a claimant is seeking compensation); *cf. Martin,* 133 S.W.3d at 264–65 ("[a] trespass to try title action is the method of determining title to lands, tenements, or other real property." (quoting TEX. PROP.CODE § 22.001)).

In this case, the Trust asserted in its amended pleadings that through the Department's contention that a navigable stream exists on the Trust's property, the Department wrongfully claimed title to part of the Trust's property. The only relief sought by the Trust was declaratory and injunctive relief to effectively determine its ownership of and right to possess the bed of the Salt Fork. The Trust did not seek compensation—the only relief available in a takings claim—nor did it seek a declaration that the Department had taken Trust property for public use. *See Bouillion,* 896 S.W.2d at 149. The difference between a takings claim and a trespass to

try title claim was clearly articulated by the court of appeals in *Porretto v. Patterson:*

> In a trespass to try title or to quiet title action, an owner sues to recover immediate possession of land unlawfully withheld. A prevailing party's remedy is title to, and possession of, the real property interest at issue in the suit.

> On the other hand, a takings claim is one in which a landowner alleges that the government has taken his property for public use without permission, for which he seeks compensation. The available remedy is a key distinction between the two. While one suit quiets title and possession of the property, the other allows only for just compensation for the property taken or used—the prevailing party does not regain use of land lost to the public's use, or win possession of it.

251 S.W.3d 701, 708 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (citations omitted).

Here, the Department has merely identified the streambed as belonging to the State because the State asserts the Salt Fork is navigable. *See* TEX. NAT. RES.CODE § 21.001(3); TEX. PARKS & WILD.CODE § 1.011(c); TEX. WATER CODE § 11.021; *Bradford,* 50 S.W.2d at 1068–69. The Trust stated in its amended pleadings that the State "wrongfully claim[ed] title" to the streambed, resting its assertion on the Department's contention that a navigable stream exists on the property. It is undisputed that the Department has not taken action to apply materials in the streambed to public use by actions such as selling them. *Cf. Porretto,* 251 S.W.3d 701 (takings claim was based on the State's leasing of property); *State v. BP Am. Prod.,* 290 S.W.3d 345 (Tex.App.-Austin 2009, pet. denied) (takings claim was based on State's grant of an oil and gas lease); and *Koch v. Gen. Land Office,* 273 S.W.3d 451

(Tex.App.-Austin 2008, pet. denied) (takings claim was based on the General Land Office's removal and sale of limestone). It has not done anything that would require it to compensate the Trust if the streambed is not navigable. Thus, the Trust cannot colorably claim that it seeks compensation by means of a suit in the nature of an inverse condemnation cause of action.

In a case such as the one before us, where the question of who owns the property is the only issue and title and possession are the only available remedies, the record and the briefs show conclusively that the Trust does not have a constitutional takings claim for compensation. *See Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840 (Tex.2007) (holding that a remand to permit a claimant to replead would serve no legitimate purpose when the underlying claim was a breach of contract claim and immunity could not be overcome). If the Trust owns the property, it is not entitled to compensation for a taking. And if the State owns the property, the Trust is not entitled to compensation because nothing was taken from it. The Trust confirms the foregoing conclusions when it says in this Court that it "does not seek money damages" and "does not seek to establish liability."[4] While the Trust has requested that if the State is granted relief in any respect, the Trust be permitted to modify the parties to assert an ultra vires claim against state officials, it makes no similar request to replead to assert a claim for compensation. The reason why is clear, as we have set out above.

Generally, a party is not entitled to relief it does not request. *State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008). And just as the Trust's suit is not one to determine the boundary between land owned by the State and land owned by the Trust, it is not a takings claim. Allowing the Trust's claim of title to be adjudicated by means of a takings claim would allow claimants to circumvent the State's sovereign immunity by creatively pleading such claims. Creative pleading cannot be used to effect the loss or waiver of the State's sovereign immunity. *See IT–Davy,* 74 S.W.3d at 856.

### 2. Response to the Dissent

The dissent would allow the Trust to pursue a takings claim even though the Trust has no claim for compensation. It would do so because,

> [b]y imposing statutory damages and civil and criminal penalties for mining a streambed without a permit, the State has all but prohibited a claimant from acting on a right asserted in good faith and risking the consequences in an action brought by the State. Legislative consent to sue for title is thus made virtually absolute.

354 S.W.3d at 406 (Hecht, J., dissenting). But even recognizing the practical effects of statutory damages and civil and criminal penalties for taking state-owned property still does not mean that the government has taken property belonging to the Trust. Under the circumstances, we fail to see how the Trust's claim is or can be for compensation, which is the only constitutional remedy for a takings claim.

Further, it seems that the dissent has mingled takings claims and ordinary claims for which legislative consent is required by its statement that "[l]egislative consent to sue for title is thus made virtually absolute." Legislative consent is not

---

4. The Trust also does not seek consequential damages. *See Omnia Comm. Co. v. U.S.,* 261 U.S. 502, 510, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (stating that "for consequential loss or injury resulting from lawful government action the law affords no remedy").

required for a constitutional takings claim to be brought. And as to a statutory waiver of immunity, the Legislature has specified that it does not intend a statute to waive sovereign immunity "unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE § 311.034. Whether Legislative consent to sue for title can be found in the statutory construct that protects materials in navigable streambeds by providing penalties for selling them without the State's permission is relevant to the Trust's title determination claim for which legislative consent is required; it is not relevant as to a takings claim for which the Constitution provides consent. Finally, construing the imposition of statutory damages and civil and criminal penalties for taking public property as effecting a constitutional taking creates a structure in which title to public property is placed at risk of transfer to private persons by default. And the dissent's proposed construct would not necessarily be limited to determining who owned the bed of a stream. It might well apply to any title dispute involving the State. Such a situation would significantly affect the Legislature's power to manage the limited resources of the State in regard to litigating title claims. We do not believe such a departure from the existing framework of statutory law and our precedent is warranted.

### D. Ultra Vires Claim

■ The Trust asserts that if the Court determines the suit cannot proceed against the Department, the Court should remand the case to permit it to add state actors as parties and pursue an ultra vires claim. The Department urges that the suit should be dismissed because there is no basis for arguing that a department official has acted ultra vires.

■ A suit against a state official for acting outside his authority is not barred by sovereign immunity. See Heinrich, 284 S.W.3d at 370–74. While suits to try the State's title are barred by immunity, in some instances a party may maintain a trespass to try title action against governmental officials acting in their official capacities. See Lain, 349 S.W.2d at 581. In Heinrich, the Court affirmed the rule that suits for declaratory or injunctive relief against a state official to compel compliance with statutory or constitutional provisions are not suits against the State. See Heinrich, 284 S.W.3d at 370–74. If a government official acting in his official capacity possesses property without authority, then possession is not legally that of the sovereign. Under such circumstances, a defendant official's claim that title or possession is on behalf of the State will not bar the suit. See Lain, 349 S.W.2d at 581–83. A suit to recover possession of property unlawfully claimed by a state official is essentially a suit to compel a state official to act within the officer's statutory or constitutional authority, and the remedy of compelling return of land illegally held is prospective in nature.

The State urges that evidence before the trial court showed a state surveyor had examined the river and determined it to be navigable and that "[g]iven the Department's express statutory authority to exercise the State's right of ownership over this sand and gravel, there is simply no basis for arguing that a department official has acted *ultra vires*." We disagree.

The Trust and the dissent point out that the Department is in a unique position. It has sovereign immunity from the Trust's suit to determine title to the streambed. Though the Trust strongly disagrees with the Department's claim of navigability, the Trust seemingly has little recourse if the Department's position that the stream is

navigable cannot be challenged by an ultra vires suit. The Department suggests that the Trust could take materials from the streambed and if the State sought civil damages filed or criminal charges, then the State would have to prove it owned the materials in the streambed by proving the Salt Fork is navigable. A landowner should not be put in such an untenable position if it can be avoided. And while we disagree that the facts before us constitute a constitutional taking, we conclude that they constitute "possession" of the streambed by the State for purposes of *Lain*.

In *Lain*, we set out the manner in which trespass to try title claims against government officials should proceed and the manner of relief that should be granted when the officials file pleas to the jurisdiction:

> [W]hen officials of the state are the only defendants, or the only remaining defendants, and they file a plea to the jurisdiction based on sovereign immunity, it is the duty of the court to hear evidence on the issue of title and right of possession and to delay action on the plea until the evidence is in. If the plaintiff fails to establish his title and right of possession, a take nothing judgment should be entered against him as in other trespass to try title cases. If the evidence establishes superior title and right of possession in the sovereign, the officials are rightfully in possession of the sovereign's land as agents of the sovereign and their plea to the jurisdiction based on sovereign immunity should be sustained. If, on the other hand, the evidence establishes superior title and right of possession in the plaintiff, possession by officials of the sovereign is wrongful and the plaintiff is entitled to relief. In that event the plea to the jurisdiction based on sovereign immunity should be overruled and appropriate relief should be awarded against those in possession. *Lain*, 349 S.W.2d at 582.

The Department has the authority to make determinations on behalf of the State as to navigability of streams and to exercise the State's rights over navigable streambeds. Nevertheless, its pronouncement that a stream is navigable is not conclusive of the question. This Court established long ago that the question of navigability is, at bottom, a judicial one. *Bradford*, 50 S.W.2d at 1070.

Here it is undisputed that the part of the streambed in question and claimed by the State to be navigable lies on land owned by the Trust. If the Salt Fork is not navigable, the Trust owns the bed. We see no good reason that the process and principles we set out long ago in *Lain* should not apply. The Trust should be given an opportunity to amend and cure the pleading and party defects, if it chooses to do so, and have the suit proceed against the governmental actors laying claim to the streambed. *See Koseoglu*, 233 S.W.3d at 840; *Lain*, 349 S.W.2d at 582.

### III. Conclusion

We reverse the judgment of the court of appeals. The case is remanded to the trial court for further proceedings in accordance with this opinion.

Chief Justice JEFFERSON filed a concurring opinion, in which Justice MEDINA, Justice WILLETT, and Justice GUZMAN joined.

Justice HECHT filed an opinion concurring in part and dissenting in part.

Chief Justice JEFFERSON, joined by Justice MEDINA, Justice WILLETT, and Justice GUZMAN, concurring.

I join the Court's opinion but offer a few additional observations about the dissent.

According to the dissent, our decision today is groundbreaking because it waives immunity for trespass to try title suits. But at least since *State v. Lain*,[1] and probably since *State v. Bradford*,[2] that has been the law in Texas. *See, e.g., Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 954 (Tex.1976) (holding, in declaratory judgment action brought by private party, that title remained with that party and not with the water authority); *Lain*, 349 S.W.2d at 586 (affirming judgment that private parties had title and possession as against state officials who claimed title on behalf of the state); *Manry v. Robison*, 122 Tex. 213, 56 S.W.2d 438, 448–49 (1932) (determining that State did not own riverbed and that private parties had title thereto); *Tex. River Barges v. City of San Antonio*, 21 S.W.3d 347, 351–52 (Tex.App.-San Antonio 2000, pet. denied) (holding that trial court correctly concluded that river was navigable).[3]

The dissent accurately notes that *Heinrich*'s ultra vires rule does not apply if the government official's acts were discretionary. The dissent then laments that allowing an ultra vires claim to determine navigability goes beyond *Heinrich* and "abolish[es] immunity altogether." 354 S.W.3d at 399. This incorrectly presumes, however, that a state official's assertion of title is a discretionary act. But navigability (which, here, determines title)

"is not a question left to the discretion and judgment of ministerial officers." *Bradford*, 50 S.W.2d at 1070. Rather, "[u]nder the law, *those officers were and are not clothed with the power to settle questions of navigability of streams, but in view of the very nature and importance of the matter, for obvious reasons, it is a question for judicial determination.*" *Id.* (emphasis added).[4] Government officials cannot choose which properties the State owns; our constitution and statutes set those parameters, and our courts decide whether they have been satisfied. *See Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410, 413 (1943) (observing that lands covered by navigable waters could not be sold by the land commissioner or other ministerial officer; such sale or grant may only be authorized by the Legislature); *see also Manry*, 56 S.W.2d at 449 (denying mandamus relief to party seeking mineral permit from the State, because evidence showed that State did not own riverbed).

In *Lain*, we made clear that a government actor is not immune from a trespass-to-try-title suit, and we described how to bring such a claim. *State v. Lain*, 162 Tex. 549, 349 S.W.2d 579, 581–82 (1961) ("One who takes possession of another's land without legal right is no less a trespasser because he is a state official or

---

1. 162 Tex. 549, 349 S.W.2d 579, 582 (1961).

2. 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932).

3. *See also, e.g.*, 17 WILLIAM V. DORSANEO, III, ET AL., TEXAS LITIGATION GUIDE § 251.04[4][b] (2011) ("A plaintiff ... may effectively evade sovereign immunity concerns by bringing a trespass to try title action against an appropriate government officer in an official capacity, because legislative consent to suit against an officer is not required in the specific context of a trespass to try title action.") (citing *Lain*, 349 S.W.2d at 581).

4. *Cf. Oklahoma v. Texas*, 258 U.S. 574, 585, 42 S.Ct. 406, 66 L.Ed. 771 (1922) (noting that government surveyors' determination created a "legal inference of navigability" that had little significance because "those officers were not clothed with power to settle questions of navigability"); *Barden v. N. Pac. R.R. Co.*, 154 U.S. 288, 320–21, 14 S.Ct. 1030, 38 L.Ed. 992 (1894) (observing that government surveyor's determination was entitled to "[s]ome weight" but was not conclusive because he was not "authorized to determine finally the character of any lands granted or make any binding report thereon").

employee, and the owner should not be required to obtain legislative consent to institute a suit to oust him simply because he asserts a good faith but overzealous claim that title or right of possession is in the state and that he is acting for an on behalf of the state."). We had earlier held that ultra vires actions remained viable, expressly rejecting the federal courts' approach (which so restricted officer suits and expanded immunity that Congress eventually passed the Quiet Title Act of 1972). *See W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 843 (1958)[5]; *see also* 28 U.S.C. §§ 2409a, 1346(f), 1402(d).

The dissent has conjured an unorthodox takings claim based on the civil and criminal penalties associated with appropriating the State's sand and gravel. There are several problems with this approach. First, if all the government has done is claim title,[6] a takings claim is premature. *Cf. Hous. N. Shore Ry. Co. v. Tyrrell,* 128 Tex. 248, 98 S.W.2d 786, 793 (1936) (noting that "[i]f the petitioner in condemnation claims the fee title to the property, his petition should be dismissed" because "[u]nless title in the condemnee is admitted the county court is without jurisdiction" (quoting *McInnis v. Brown Cnty. Water Improvement Dist. No. 1,* 41 S.W.2d 741, 744 (Tex.Civ.App.-Austin 1931, writ ref'd))); *see also Wisc. Valley Improvement Co. v. FERC,* 236 F.3d 738, 743–44 (D.C.Cir.2001) (observing that plaintiff could try its title claims in either state court or a federal district court and, if successful, could then pursue a takings claim in the Court of Federal Claims); 2 NICHOLS ON EMINENT DOMAIN § 5.02[2][b] (3d ed.2010) ("If petitioners claim title to the land they wish to occupy, a petition for condemnation is not the proper proceeding to institute for the purpose of trying the question."). We have long recognized that "there is irreconcilable inconsistency between an allegation by the condemnor of the entire title, or a paramount title, in himself, and the taking of the property of another by the proceeding; that condemnation rests upon necessity, and there can be no necessity to acquire what one already owns." *Tyrrell,* 98 S.W.2d at 794.

Second, authorizing a takings claim to determine title, when the Department has merely asserted ownership, evades statutory trespass-to-try-title requirements. A trespass-to-try-title suit is generally the only way to resolve contested title claims, even when its requirements have sometimes produced harsh results. TEX. PROP. CODE § 22.001(a); *Martin v. Amerman,* 133 S.W.3d 262, 265 (Tex.2004). Whether such strictures are good policy[7] is a ques-

---

5. We stated:

> Our quotation of portions of the opinion in [*Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)] dealing with the contract phase of the case is not to be considered as an approval of the limitation imposed on the rule of *United States v. Lee* as that rule has been adopted and applied by the courts of this state in *Imperial Sugar Co. v. Cabell* [179 S.W. 83 (Tex.Civ.App.-Galveston 1915)] and *State v. Epperson* [121 Tex. 80, 42 S.W.2d 228 (1931)], a limitation vigorously questioned in the dissenting opinion of Mr. Justice Frankfurter. *We have no*

*disposition to extend or broaden the rule of immunity in this state.*
*W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 843 (1958) (emphasis added) (citations omitted).

6. *See* 354 S.W.3d at 392 (noting that the Department "has not done anything that would require it to compensate the Trust if the streambed is not navigable").

7. *See, e.g.,* William V. Dorsaneo, III, *Dorsaneo on Trespass to Try Title Actions, Martin v. Amerman, and H.B. 1787,* 2008 EMERGING IS-SUES 759, at *1 (Oct. 17, 2007) (asserting that "it is past time for the abolition of trespass to

tion for the Legislature, not the courts. Allowing a party to litigate title through a takings claim will essentially override these statutory requirements.

Third, the dissent would hold that a takings claim is viable when the government imposes severe penalties for an individual's legitimate assertion of title. At what point are penalties so severe that a takings action is authorized? A proliferation of lawsuits on "severity" is the predictable consequence of the dissent's approach. Even if the severity of a financial penalty could be defined, rarely will a case arise in which a criminal sanction does not accompany the theft of state property. And even if there were such a case, a landowner would be forced to sell natural resources at its peril, subject to a conversion claim the State *might* bring. How can a party manage its property without knowing whether it will be subject to liability for doing so?

The issue here is not whether the Department has taken Trust property but who owns the property in the first place. Answering that question will resolve this case, and under longstanding precedent, an ultra vires action—not a takings claim—is the appropriate vehicle for doing so.

Justice HECHT, concurring in part and dissenting in part.

By today's decision, the Court abolishes the State's immunity from suit to determine title to real property. All the plaintiff must do is name some state official as the defendant. The suit proceeds as against a private defendant. Of course, naming a state official instead of the State is a complete fiction. For all practical purposes, the suit is against the State. If the plaintiff's claim is superior to the State's, as advocated by the state official, the plaintiff wins, and the State is bound by the judgment.

In the Court's view, repeated in the concurring opinion, the State has *never* been immune from suit over real property, having announced that ruling fifty years ago in *State v. Lain.*[1] It is difficult to take this view seriously. For one thing, if it were true, then we should have granted this petition for review when it was first filed and reversed and remanded in a two-page per curiam opinion, as we ordinarily would whenever the court of appeals has ruled directly contrary to an opinion of this Court. Instead, we requested full briefing, denied the petition, granted rehearing, requested more briefing, heard argument, and struggled with the issues. That's a lot of work to apply law that has been settled for fifty years ago.

Moreover, the courts of appeals have been divided in their view of *Lain,* with one reading that decision narrowly,[2] and three construing it more broadly.[3] *Lain* unquestionably allows suit against a government official when suit against the government itself would be barred. Less

try title actions as the exclusive method of determining land title disputes generally").

1. 162 Tex. 549, 349 S.W.2d 579, 582–583 (1961).

2. *State v. Riemer,* 94 S.W.3d 103, 110 (Tex. App.-Amarillo 2002, no pet.); *see also Cornelius v. Armstrong,* 695 S.W.2d 48, 49 (Tex.App.-Tyler 1985, writ ref'd n.r.e.).

3. *Fleming v. Patterson,* 310 S.W.3d 65, 70 (Tex.App.-Corpus Christi–Edinburg 2010, no pet.); *State v. BP Am. Prod. Co.,* 290 S.W.3d 345, 356–357 (Tex.App.-Austin 2009, pet. denied); *Porretto v. Patterson,* 251 S.W.3d 701, 711 (Tex.App.-Hous. [1st Dist.] 2007, no pet.); *Texas Parks and Wildlife Dep't v. Callaway,* 971 S.W.2d 145, 152 (Tex.App.-Austin 1998, no pet.); *Bell v. State Dep't of Highways and Pub. Transp.,* 945 S.W.2d 292, 295 n. 1 (Tex. App.-Hous. [1st Dist.] 1997, pet. denied).

clear is whether, to prevail in a suit against a government official, the plaintiff must prove only that the official is in error in asserting a claim to property on behalf of the government, which is all the plaintiff would be required to prove against a private defendant, or whether the plaintiff must prove more: either that the official abused his discretion in asserting his claim, or that he had no discretion to assert the claim, or that he had no power to act at all. Only because the Court holds today that a plaintiff's burden of proof against a public official is no different than in a suit against a private individual, and the government is bound by a judgment against its officer, does it follow that the government has no immunity from suit.

It is difficult to square the Court's broad reading of *Lain* with its much narrower holding recently in *City of El Paso v. Heinrich*.[4] There we allowed suit against a city pension fund's trustees in their official capacity for acting *ultra vires* in denying the plaintiff's claim for benefits even though the city, the fund, and the board were all immune from suit.[5] But "[t]o fall within this *ultra vires* exception," we held, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."[6] Because of this restriction, an *ultra vires* suit is an "exception" to the government's immunity from suit; it does not destroy immunity from suit.

Today—*and for the first time*—the Court allows a plaintiff to sue a government official for title to property, and recover in practical effect against the government itself, proving no more than would be required in a suit against a private defendant. The only remaining immunity from suit is in name only: the government cannot be sued, but its actors can. Why this should be—or as the Court believes, should always have been—the rule for title suits but not for suits for pension benefits, like *Heinrich*, for example, is not clear. Why the government's immunity from suit in tort and contract should be absolute, subject only to statutory waiver, its immunity from suit for the unauthorized actions of its agents should be subject to the narrow *Heinrich* exception, and its immunity from suit over title to real property should be nonexistent is a puzzle to which the Court is strangely oblivious.

I agree with the Court that respondent's declaratory judgment claim fails. In my view, the law affords a practical solution for settling title disputes with the government that preserves immunity while providing a resolution of serious issues. When the government is met with a claim of ownership contrary to its own that it considers serious, it can sue for a resolution, thus waiving immunity. It would be required to sue to protect its own interests. When the government considers its own possible claim not worth asserting, the individual claimant has the property. But when the government claims immunity from suit over title, refuses to sue for a resolution of the dispute, and imposes criminal penalties on the individual claimant for treating the property as his own, the government has removed itself from the proper scope of immunity. In that situation, I would permit the individual claimant to sue for a taking, for which the government has no immunity.

At bottom, I would allow the government to preserve its immunity from suit

---

**4.** 284 S.W.3d 366 (Tex.2009).

**5.** *Id.* at 370–372.

**6.** *Id.* at 372.

but would preclude it from making that immunity absolute. Because the Court chooses to abolish immunity altogether, I respectfully dissent.

## I

The parties agree that if the Salt Fork of the Red River is "navigable", a term that by statute refers to "a stream which retains an average width of 30 feet from the mouth up",[7] the State owns the bed on the Sawyer Trust ranch; if not, the Trust owns it.[8]

> The bed of a stream is that portion of its soil which is alternatively covered and left bare as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during an entire year, without reference to the extra freshets of the winter or spring or the extreme droughts of the summer or autumn.... [The bed] include[s] all of the area which is kept practically bare of vegetation by the wash of the waters of

the river from year to year in their onward course, although parts of it are left dry for months at a time.... [9]

Determining whether the Salt Fork is "navigable" is not an easy matter. It rises in the Texas Panhandle near Amarillo and flows southeastward some fifty miles to Greenbelt Lake, just north of Clarendon, then extends another hundred miles or so across Texas and Oklahoma to its mouth in the Prairie Dog Town Fork of the Red River.[10] The Salt Fork crosses the Trust's property just below the Greenbelt Lake dam. No water flows there, except in floods. Even before the dam was built in 1966, there was never enough water in the Salt Fork on the Trust property for regular use.[11]

In 2006, the Trust contracted for the mining of sand and gravel from the dry streambed. But removal of such materials from the bed of a navigable stream requires a $1,200 permit[12] issued by the

---

7. Tex. Nat. Res.Code § 21.001(3).

8. *See State v. Bradford*, 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932) ("The rule long has been established in this state that the state is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute...."). The Department also contends that the Salt Fork on the Trust's property is governed by the "Small Bill", Tex.Rev. Civ. Stat. Ann. art. 5414a-1, which grants title to the beds of certain "water courses or navigable streams".

9. *Brainard v. State*, 12 S.W.3d 6, 16 (Tex. 1999) (citations omitted).

10. Texas State Historical Ass'n, *Salt Fork of the Red River*, The Handbook of Texas Online, http://www.tshaonline.org/handbook/online/articles/rns05 (last visited Aug. 21, 2011); Texas State Historical Ass'n, *Greenbelt Lake*, The Handbook of Texas Online, http://www.tshaonline.org/handbook/online/articles/rog09 (last visited Aug. 21, 2011); Texas State Historical Ass'n, *Donley County*, The Handbook of Texas Online, http://www.tshaonline.org/

handbook/online/articles/hcd10 (last visited Aug. 21, 2011); 30 Tex. Admin. Code § 307.10(3), App. C.

11. This evidence offered by the Trust has not been challenged and thus must be taken as true for purposes of resolving the jurisdictional issues before us. *See Tex. Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004) ("[I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.").

12. Tex. Parks & Wildlife Code § 86.002(a) ("No person may disturb or take marl, sand, gravel, shell, or mudshell under the management and protection of the commission or operate in or disturb any oyster bed or fishing water for any purpose other than that necessary or incidental to navigation or dredging under state or federal authority without first having acquired from the commission a permit authorizing the activity."); 31 Tex. Admin. Code § 69.104 (stating that with exceptions,

**400**

Texas Parks and Wildlife Department, which may be subject to various conditions.[13] The permittee must also post a bond[14] and pay royalties.[15] The Trust's contractor inquired of the State whether it claimed that the Salt Fork is navigable. When the State would not take a position one way or the other, the Trust sued the Department for a declaration that the Salt Fork is non-navigable. The Department asserted immunity,[16] still refusing to take a position on navigability, but after a hearing before the district court, it agreed to arrange for the Director of Surveying of the Texas General Land Office to visit the Trust property. He found that all water channels on the property were dry but that at one point the riverbed was 330 feet wide. Based on his brief observations at the site and his review of a few unspecified field notes from the original surveys, he concluded that the Salt Fork is navigable.[17]

"the disturbance of sedimentary materials under the management and protection of the commission must be authorized under the terms and conditions of either an individual or a general permit"); id. § 69.114(a) (stating that "applications for permits to take or disturb sedimentary material shall be accompanied by the following nonrefundable application fees: (1) $1,200 for applications to take sedimentary material for purposes of sale").

13. Id. § 69.111(a) ("The director [of the Department] may make such reasonable requirements of the permittee as required to effectuate the intent of Chapter 86 of the Parks and Wildlife Code.")

14. Id. § 69.111(b) ("The director shall require the permittee to make a good and sufficient bond payable to the department, and conditioned upon the prompt payment of charges for sedimentary materials and any damage done to property under the ownership or trusteeship of the state.").

15. Id. § 69.121(a).

16. See TEX. PARKS & WILDLIFE CODE § 11.011 ("The Parks and Wildlife Department is established as an agency of the state. It is under the policy direction of the Parks and Wildlife Commission.").

17. I quote the report of the Director of Surveying in full:

> Report of Inspection
> Salt Fork of the Red River
> Donley County, Texas

A visit was made to the Salt Fork of the Red River in Donley County on August 22, 2006, for the purpose of determining if the stream was statutorily navigable. The inspection was made at a point approximately 4.7 miles north of Clarendon and less than one mile downstream from the dam creating Greenbelt Lake. Bob Sweeney, an attorney for the Parks & Wildlife Department, and I met with the landowner, a Mr. Sawyer, and his surveyor, Maxey Sheppard, LSLS.

The Salt Fork of the Red River is a "Small Bill" stream. All of the original land surveys in the vicinity cross the river even though, in the vicinity of the inspection site, the stream bed widths recited in the patent field notes for the original surveys vary from a minimum of 70 varas (194 feet) to as much as 453.5 varas (1260 feet) and at a point 5 miles west, above Greenbelt Lake, there is a reported width of 463 varas (1286 feet).

The inspection point on the river was in the vicinity of the southwest corner of G.C. & S.F. Ry. Co. Survey No. 7, Abstract No. 282, in the east line of the Socorro Irrigation Co. Survey No.5, Abstract No. 238. Aerial photography indicates that, at this point, the river is separated into two channels by a rather large island. Only the north channel was inspected.

As with many high plains streams, the Salt Fork of the Red River is a wide sand-bed river with numerous channels lying between the river banks. The area of inspection was less than one mile below the dam creating Greenbelt Lake and at this point the riverbed is dry except when occasional releases are made from the lake. The riverbed at the point of inspection is vegetated from bank to bank but not with typical upland vegetation. The banks of the stream are well defined on both sides of the bed. There exist at least three separate water channels between the banks but all of them are dry at this time. The portion of the riverbed north of the island at the point of inspection was found to be approximately 330 feet in width.

Based on the above-recited observations, it is my opinion that the Salt Fork of the Red

The trial court refused to dismiss the case, and the court of appeals affirmed.[18]

## II

I agree with the Court that the Trust's suit against the Department to determine title to the bed of the Salt Fork is barred by immunity.[19] In *State v. Lain,* we held that "[w]hen in this state the sovereign is made a party defendant to a suit for land, without legislative consent, its plea to the jurisdiction of the court based on sovereign immunity should be sustained in limine." [20] For the reasons the Court explains, the State's immunity from land claims is not waived by the Declaratory Judgment Act.[21] Immunity in this context serves important purposes. It preserves the separation of powers between the Legislative and Judicial Departments by limiting courts' authority to decide policy matters that may attend disputes over the State's ownership of property.[22] Immunity also respects the Executive Department's authority and discretion to handle property dispute issues on a consistent and comprehensive basis. In this case, for example, a decision on the navigability of the Salt Fork would have ramifications for other landowners, not only up and down the Salt Fork, but adjacent other streams as well. And immunity protects the State from the burdens of litigation that would require diversion of limited revenues from other purposes considered more important.

I also agree that immunity would not bar an *ultra vires* action by the Trust against an appropriate official for asserting the State's ownership of the bed contrary to law. Again, *Lain* holds:

> Well reasoned and authoritative decisions of the Supreme Court of the United States and of the courts of this state support the view that a plea of sovereign immunity by officials of the sovereign will not be sustained in a suit by the owner of land having the right of possession when the sovereign has neither title nor right of possession.[23]

We recently reconfirmed in *City of El Paso v. Heinrich* that *ultra vires* actions are permissible,[24] but history teaches that the line between such actions and actions for which the government retains immunity is hard to draw. The specific Supreme Court decision to which *Lain* referred was *United States v. Lee,*[25] in which the Court, 5–4, upheld a suit against federal officials to void the seizure of General Robert E. Lee's wife's Arlington estate for nonpayment of $92.07 taxes after it had been sold to the United States for $26,800 for use as a national cemetery. *Lee* was the most

River is a statutorily navigable stream at this point.
/s C.B. Thomson
C.B. Thomson, LSLS, RPLS, PE
Director of Surveying
Texas General Land Office

**18.** 354 S.W.3d 489 (Tex.App.-Amarillo 2007).

**19.** *Ante* at 393 (citing *City of El Paso v. Heinrich,* 284 S.W.3d 366, 372–373 (Tex.2009), and *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579, 582 (1961)).

**20.** *Id.*

**21.** *Ante* at 387.

**22.** *See Federal Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 413–415 (Tex.1997) (Hecht, J., concurring) (stating that the decision whether to waive immunity from suit on a contract "involves policy choices more complex than simply waiver of immunity" and that "the Legislature . . . is better suited to deciding the kinds of political issues that . . . attend claims against the State").

**23.** *Lain,* 349 S.W.2d at 581.

**24.** *Heinrich,* 284 S.W.3d at 371.

**25.** 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882).

celebrated case of several over many years in which the Court attempted to set out exactly when a suit for land from which the United States is immune could be brought against a government official. Toward the end of this exercise, the Court admitted that it had been "inconsistent" [26] in determining whether to allow "officer suits", observing that "it is fair to say that to reconcile completely all the decisions of the Court in this field ... would be a Procrustean task." [27]

Eventually, the Supreme Court "cut through the tangle" of its decisions and applied to land disputes the general rule it had announced for officer suits in *Larson v. Domestic & Foreign Corp.*: [28]

> the action of a federal officer affecting property claimed by a plaintiff can be made the basis of a suit for specific relief against the officer as an individual only if the officer's action is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void.[29]

The difficulty with respect to land disputes evaporated with Congress' passage of the Quiet Title Act of 1972,[30] which waived the federal government's immunity from suits for land under certain conditions but also provide[d] the exclusive means by which adverse claimants [can] challenge the United States' title to real property.[31]

The Texas Legislature has not acted similarly to free us of the continuing struggle to determine when government officers may be sued though the government is immune. We held in *City of El Paso v. Heinrich* that an *ultra vires* suit is permitted when a government official has acted contrary to a statute requiring him to "perform[ ] in a certain way, leaving no room for discretion".[32] This rule may not be as restrictive as the rule in *Larson*, as its application depends on the difficult decision of what is properly within an official's discretion and what lies beyond. Locating the banks of a stream to determine navigability may [33] or may not [34] involve discretion; determining from a single measurement and a few surveys that "a stream retains an average width of 30 feet from the mouth up" [35] may be an abuse of discretion. But we cannot decide these issues here because the Trust has not brought an *ultra vires* action. The Department insists that a discretionary determination was made and that any *ultra vires* action the Trust may assert will fail. The Court removes that argument by holding that an appropriate state official may

---

**26.** *Block v. North Dakota*, 461 U.S. 273, 281, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).

**27.** *Id.* (quoting *Malone v. Bowdoin*, 369 U.S. 643, 646, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962)).

**28.** 337 U.S. 682, 702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

**29.** *Block*, 461 U.S. at 281, 103 S.Ct. 1811 (quoting *Malone*, 369 U.S. at 647, 82 S.Ct. 980, in turn quoting *Larson*, 337 U.S. at 702, 69 S.Ct. 1457) (internal quotation marks omitted).

**30.** Act of Oct. 25, 1972, Pub.L. No. 92–562, 86 Stat. 1176 (codified at 28 U.S.C. § 2409a, 28 U.S.C. § 1346(f), and 28 U.S.C. § 1402(d)).

**31.** *Block*, 461 U.S. at 286, 103 S.Ct. 1811.

**32.** *Heinrich*, 284 S.W.3d at 371.

**33.** *See Bradford*, 50 S.W.2d at 1069 (stating that a determination of navigability will not be held void where "the surveying officers ... made the surveys in the exercise of their discretion and honest judgment").

**34.** *See Brainard v. State*, 12 S.W.3d 6, 10 (Tex.1999) ("The differences between the parties' surveys (and, in particular, their chosen river banks) are based on conflicting legal theories that we must resolve.").

**35.** Tex. Nat. Res.Code § 21.001(3).

be sued, just as a private person would be, and judgment rendered against the State.

## III

The Department contends that there are only two ways for the Trust to challenge the State's assertion of ownership of the Salt Fork bed. One is for the Trust to seek permission from the Legislature to sue.[36] The Department concedes that this may be difficult, citing only one instance in which the Legislature has ever granted consent in similar circumstances.[37] But it argues that the difficulty is justified by the important purposes immunity serves.

The Trust's only other alternative, the Department contends, is to proceed with its mining plans and risk the consequences. This is not simply a dare. The Department might reconsider its claim of ownership or otherwise decide to take no action against the Trust. Or the Department might sue for damages, in which case it would not be immune from the Trust's counterclaim to determine title.[38] The Department would have to determine whether its claim was strong enough to justify losing-the expense of litigation as well as the ramifications of an adverse decision. If the Department prevailed on a claim for common-law conversion, the Trust would be liable, if it acted in good faith, for only the net value of the property taken, and if it did not act in good faith, for the gross value of the property and the Department's expenses in recovering it.[39] The Trust would not be liable for punitive damages unless it acted with malice.[40] The Trust would have to evaluate whether the strength of its claim justified its exposure or whether it would be to its benefit in the long run to apply for a permit and pay the State a royalty. A Department-initiated suit for conversion presenting roughly correlative risks to each side preserves immunity and the purposes its serves while providing a viable mechanism for resolving the ownership dispute.

But conversion would not be the only action available to the Department, nor would the Trust's risk be limited to common-law damages. By statute, a person who removes sand and gravel belonging to the State without a permit may also be liable for consequential damages [41] as well

---

**36.** *See* Tex. Civ. Prac. & Rem.Code §§ 107.001–.005 (providing framework for legislative consent to sue).

**37.** *Brainard*, 12 S.W.3d at 10.

**38.** *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375–376 (Tex.2006) ("[I]t would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."); *Anderson, Clayton & Co. v. State*, 122 Tex. 530, 62 S.W.2d 107, 110 (1933) ("[W]here a state voluntarily files a suit and submits its rights for judicial determination it will be bound thereby and the defense will be entitled to plead and prove all matters properly defensive. This includes the right to make any defense by answer or cross-complaint germane to the matter in controversy.").

**39.** *Moore v. Jet Stream Investments, Ltd.*, 261 S.W.3d 412, 428–429 (Tex.App.-Texarkana 2008, pet. denied)

**40.** *Bennett v. Reynolds*, 315 S.W.3d 867, 871–872 (Tex.2010); Tex. Civ. Prac. & Rem.Code § 41.003(a) (stating that, with exceptions, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence"); *id.* § 41.001(7) ("'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant.").

**41.** Tex. Parks & Wildlife Code § 86.023 "A person who takes marl, sand, gravel, shell, or mudshell under the jurisdiction of the commission in violation of this chapter or a rule

as "a civil penalty of not less than $100 or more than $10,000 for each act of violation and for each day of violation".[42] Further, mining the State's sand and gravel without a permit is a crime [43] punishable by a fine of $25 to $500 per day.[44] With the addition of these statutory civil and criminal penalties, the State has gone to some lengths to discourage any provocation for it to litigate ownership disputes.

The Trust argues for a third alternative: a suit for a taking of its property without compensation in violation of article I, section 17 of the Texas Constitution. The Department acknowledges that it is not immune from such suits but argues that the Trust cannot sue for a taking in this situation. The Court agrees for what I take to be three reasons.

First, the Court notes that "the State has not expressed an intent to take property belonging to the Trust [but] . . . has merely identified the streambed as belonging to the State".[45] But to say that the State is claiming only what it owns obviously begs the question. The Department argues that the government cannot have the intent to take property necessary to trigger a constitutional right to compensation as long as it reasonably believes it owns the property, but the Court does not even require that government's belief be reasonable. And this case illustrates what the Department means by reasonable belief: from one measurement of the dry

riverbed on the Trust's property and a few unidentified field notes, one can infer that the Salt Fork has an average width of thirty feet from the mouth up. With no more basis than that, the Department's assertion of ownership is little more than a grab. The rule the Court implicitly applies is that the State never takes something it claims to own, however unfounded the claim may be. The government cannot avoid its constitutional responsibility simply by wishful thinking.

Second, the Court states that "[t]he Trust's suit is an action to determine whether it owns the streambed, not one for compensation".[46] But the fact that the Trust *has not sued* for compensation to date does not mean that it *cannot sue* for a taking in this situation. The Trust *has not sued* a state official, yet the Court explains at length that the Trust *could* bring an *ultra vires* action. There is no less reason to consider whether the Trust *could sue* the Department for a taking if it asserted a claim for compensation. This case is not about pleadings; it is about immunity.

Third, the Court argues that "[a]llowing the Trust's claim of title to be adjudicated by means of a takings claim would sanction claimants' circumventing the State's sovereign immunity by . . . [c]reative pleading. . . ."[47] But it may just as well be said that allowing the State to assert immunity from a takings suit merely because it

---

adopted under this chapter is liable to the state for the value of: (1) the material taken; and (2) any other natural resource under the department's jurisdiction that is damaged or diminished in value.".

**42.** *Id.* § 86.024.

**43.** *Id.* § 86.022 ("A person who violates Section 86.002 [that is, mines sand and gravel without a permit] . . . commits an offense that is a Class C Parks and Wildlife Code misdemeanor.").

**44.** *Id.* §§ 12.406 ("An individual adjudged guilty of a Class C Parks and Wildlife Code misdemeanor shall be punished by a fine of not less than $25 nor more than $500."); 86.002(b) ("Each day's operation in violation of this section constitutes a separate offense.").

**45.** *Ante* at 391.

**46.** *Ante* at 392.

**47.** *Ante* at 392.

claims title would sanction the State's circumvention of its constitutional responsibility. If a takings claim—which the Department concedes immunity would not bar—can be asserted even though title is disputed, then its assertion cannot be dismissed as creative pleading.

Not only does the Court offer no persuasive reason for holding that the Trust has no takings claim,[48] it allows a contrary result in a similar case to stand by denying the petition for review today in *Koch v. Texas General Land Office*.[49] There, Koch sued the General Land Office for taking limestone from her land for highway construction. The State claimed ownership of the limestone because its 1926 land patent to Koch's predecessor reserved "[a]ll of the minerals", despite our holding in a 1949 case that ordinary limestone is not a mineral.[50] The GLO argued that the rule in that case should not apply retroactively or to the State, that it therefore had a colorable claim to the limestone, and that "if the State believes it is the owner of property, its use of that property cannot be an intentional act to take the property of another."[51] The court rejected this Cartesian *credo ergo capio* argument:

> We are not persuaded that the State's subjective belief regarding its title to property, by itself, changes or dictates the capacity in which the State acts.... When a plaintiff alleges a state taking of property and title to that property is in dispute, the State cannot evade its constitutional obligations merely by asserting that it "believes" it is acting as landowner rather than as sovereign regardless of whether that belief is, in fact, accurate. Otherwise, the State would be in the position of unilaterally determining the outcome of takings disputes simply by declaring a subjective belief—whether right or wrong—that it thought it owned the property.[52]

The court noted that two other courts had held that a dispute over the ownership of property does not preclude a suit for its taking.[53]

---

**48.** The Department also argues that if the Trust had a constitutional claim, it would be for a regulatory taking because the Trust's only complaint is that it must obtain a permit for its proposed mining operations. "Physical possession is, categorically, a taking for which compensation is constitutionally mandated, but a restriction in the permissible uses of property or a diminution in its value, resulting from regulatory action within the government's police power, may or may not be a compensable taking." *Sheffield Development Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 669–670 (Tex.2004) (footnote omitted). The Department contends that because the Trust has not pleaded and cannot show that the permit requirement severely impacts the value of the property, it has no regulatory takings claim. *See id.* at 672–673. But the disagreement between the Trust and the Department is over ownership of the riverbed, not the requirement of a permit to mine it. This is not a regulatory takings case.

**49.** 273 S.W.3d 451 (Tex.App.-Austin 2008, pet. denied).

**50.** *Heinatz v. Allen*, 147 Tex. 512, 217 S.W.2d 994, 997 (1949) ("In our opinion substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitably be manufactured into cement. Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word.").

**51.** *Koch*, 273 S.W.3d at 458.

**52.** *Id.* at 458–459.

**53.** *Id.* (citing *Porretto v. Patterson*, 251 S.W.3d 701, 709–710 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (holding that a person claiming ownership of property could sue the State for a taking for having leased it); *Kenedy Mem'l Found. v. Mauro*, 921 S.W.2d 278, 282 (Tex.

*Koch* and the present case are quite similar. The ownership issue in *Koch* was purely legal: what did "mineral" mean in the State's land patent. The ownership issue in the present case may be partly legal—what standards govern the measurements made to determine navigability—and partly factual—the actual measurements themselves. But the basic nature of the issues in the two cases is the same. In both cases, the State argues that it cannot take property it reasonably believes it owns, but the bases for its belief are shaky: in *Koch* it claims that limestone is a mineral in the face of a contrary decision from this Court, and in the present case it claims that the Salt Fork is thirty feet wide on average, source to mouth, on the strength of one measurement and some unidentified notes. And although Koch sued for damages while the Trust has sought only declaratory and injunctive relief, nothing would prevent the Trust from adding a claim for damages.

In *Koch*, the State actually removed the limestone, while here, the State has only asserted that the Trust cannot remove sand and gravel without a permit. But in both cases, the State claims ownership of the property in issue. A permit to remove sand and gravel is required, not for the purpose of regulating a landowner's use of his own property, but to protect the State's right to its property. The imposition of a royalty in connection with the permit is based on the State's ownership of the material being mined. The State claims the right to remove sand and gravel from the Trust ranch, just as it removed limestone from Koch's property, only it has not yet chosen to exercise that right.

At bottom, this distinction in the two cases is one without a difference.

In my view, an action for a constitutionally compensable taking of property is not precluded merely by a dispute between the claimant and the government over ownership of the property. To hold otherwise would allow the government to avoid its constitutional obligation whenever it chose to do so. Nor do I think a takings action can be precluded when the government's belief in its right to the property is colorable or even reasonable. Such a rule would depreciate the constitutional right too much. On the other hand, to hold that the government's claim to property may always be challenged in a takings action would vitiate the rule of *Lain*, that the government is immune from such suits, and abolish any need for *ultra vires* actions. It is not necessary to go that far in this case.

The dilemma presented here results not from the State's assertion of immunity as a shield to prevent being drawn into litigation, but its use as a sword to discourage all claims to streambeds. By imposing statutory damages and civil and criminal penalties for mining a streambed without a permit, the State has all but prohibited a claimant from acting on a right asserted in good faith and risking the consequences in an action brought by the State. Legislative consent to sue for title is thus made virtually absolute. The effect is to shift authority for determining whether the State has taken a person's property without compensation from the Judicial Department to the Legislative Department, in violation of the fundamental principle that it is for the courts to decide what the

App.-Corpus Christi 1995, writ denied) (holding that immunity did not bar a takings claim merely because the State disputed the plaintiff's ownership of the property). This Court later noted in *Kenedy*, however, that the State's immunity had been waived by statute. *Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 289 & n. 71 (Tex.2002)).

constitution requires.[54] In these circumstances, I would hold that a takings action must be allowed. If the State loses that action, it must pay for property it might prefer not to have. Thus as a practical matter, the availability of a takings action forces the State to consider more carefully the strength of its claim. The State may statutorily increase the punishment for conversion, but it does so at the risk of incurring damages for insubstantial claims of ownership.

\* \* \*

For these reasons, I would hold that the Trust may assert a claim for compensation against the Department under article I, section 17 of the Constitution. From the Court's decision to waive the State's immunity completely, I respectfully dissent.

54. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).