**Opinion issued August 6, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00436-CV

———————————

### CITY OF HOUSTON, TEXAS, Appellant

### V.

### 4 FAMILIES OF HOBBY, LLC, 4 FAMILIES OF HOUSTON, LLC, AND PAPPAS RESTAURANTS, INC., Appellees

On Appeal from the 189th District Court
Harris County, Texas
Trial Court Case No. 2023-22872

# O P I N I O N

This suit arises from the City of Houston's ("the City") recent three-year procurement process for food and beverage concessions at William P. Hobby Airport ("Hobby"). The City ultimately awarded the concession contract to Areas HOU JV,

LLC ("Areas")[1] over 4 Families of Hobby, LLC ("4 Families"), 4 Families of Houston, LLC ("4 Families-Houston"), and Pappas Restaurants, Inc. ("Pappas Restaurants") (collectively, "Pappas"). Pappas then sued the City. It alleged various causes of action and sought a permanent injunction to declare the contract awarded to Areas void.

The City responded with a plea to the jurisdiction asserting governmental immunity as to all of Pappas's claims against it. After an oral hearing, the trial court denied the City's plea. In a single issue, the City challenges the denial of its plea to the jurisdiction.

We reverse and render in part and affirm in part.

### Background

The Houston Airport System ("HAS")—a department of the City—manages three major airports in the Houston area: Hobby, George Bush Intercontinental Airport ("IAH"), and Ellington Field/Houston Spaceport ("Ellington Field").

In 2002, 4 Families-Houston won a bid to oversee all elements of Hobby's food and beverage concessions, including the operation of eleven restaurants within the airport and four Pappas Restaurants concepts. For twenty years, Pappas provided food and beverage concessions at Hobby pursuant to a "Food and Beverage

---

[1] Areas is named as a defendant below but is not a party to this appeal.

2

Concession Agreement at William P. Hobby Airport between City of Houston, Texas and 4 Families of Houston, Joint Venture,"[2] dated January 12, 2003, and amended effective July 1, 2006 ("Pappas Contract").

In September 2019, the City and HAS began a solicitation process to identify a concessionaire for new food and beverage concessions at Hobby. For a variety of reasons—including the COVID-19 pandemic—this process continued through three rounds into 2022.

In September 2022, Houston issued Solicitation No. T32496, its third Request for Proposals for Food and Beverage Concessions at Hobby (the "RFP"). 4 Families—in which Pappas Restaurants is a member—submitted a proposal in response to the RFP. Six other proposed concessionaires also submitted proposals to the City, including Areas. As a result of the proposals submitted in response to the RFP, the City narrowed its search to two potential concessionaires—4 Families and Areas. The City ultimately recommended Areas as the most qualified, based in part on compensation scores.

The proposed concessions agreement between the City and Areas, and the ordinance approving that agreement (Ordinance No. 2023-0154), was noticed for consideration and approval by the Houston City Council three times: February 22,

---

[2] Pappas alleged that 4 Families-Houston is a successor-in-interest to 4 Families of Houston, Joint Venture and, as such, is a party to the Pappas Contract.

2023, March 1, 2023, and March 8, 2023. Ordinance No. 2023-0154 was ultimately approved by the City Council on March 8, 2023. Based on the approval of this ordinance, the City and Areas executed a Food and Beverage Concession Agreement (the "Areas Contract") the following day.

A month later, 4 Families and Pappas Restaurants filed this suit. The City subsequently filed a plea to the jurisdiction, asserting governmental immunity. An oral hearing on the City's plea was set for June 6, 2023.

Thereafter, 4 Families and Pappas Restaurants filed a first amended petition. It alleged claims for (1) Violation of Chapter 252 of the Texas Local Government Code, (2) Breach of Unilateral Procurement Contract, (3) Breach of Pappas Contract, (4) Violation of the Texas Open Meetings Act ("TOMA"), and (5) Request for Declaratory Judgment under the Uniform Declaratory Judgments Act ("UDJA").[3] The City then filed a first amended plea to the jurisdiction, again asserting that it was entitled to governmental immunity as to all of Pappas's claims. The City set its amended plea for hearing on the previously set hearing date of June 6, 2023.

Eight days before the hearing, Pappas filed a second amended petition. It added (1) a claim for violation of the Equal Rights Guarantee under the Texas

---

[3] Pappas also sought a temporary restraining order to preserve the status quo by suspending performance of the Areas Contract. The trial court denied that request on May 5, 2023. Thus, upon the expiration of the Pappas Contract on May 11, 2023, 4 Families moved out of Hobby.

Constitution, (2) a claim against Areas for tortious interference with prospective business relationships, and (3) 4 Families-Houston as a plaintiff. The second amended petition incorporated 13 exhibits—including the RFP, the Pappas Contract, the City Council meeting agendas, and the Areas Contract. Pappas also filed a response to the City's first amended plea the same day.

The City did not file a new plea to the jurisdiction to Pappas's second amended petition. Instead, four days before the oral hearing, the City filed a reply in support of its first amended plea. The City's reply addressed the new equal protection claim and sought to have the second amended petition dismissed in its entirety.

At the conclusion of the hearing on June 6, 2023, the trial court denied the City's first amended plea to the jurisdiction. A written order to that effect was signed the next day. This appeal ensued.

## Plea to the Jurisdiction

The City maintains that the trial court erred in denying its first amended plea to the jurisdiction as to all of Pappas's claims against it. But first, we must address some threshold matters.

### A. Mootness

Pappas argues that this Court should uphold the trial court's denial of the City's first amended plea to the jurisdiction because that plea was rendered moot (at least in part) by the filing of the second amended petition. As noted above, the City

5

did not further amend its plea to specifically challenge Pappas's second amended petition—which added a new claim against the City.

Mootness implicates subject matter jurisdiction, and an appellate court is prohibited from deciding a controversy that is moot. *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634 (Tex. 2021). A matter becomes moot when "(1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion." *Id.* at 634–35.

In that regard, claims raised in an original petition or a prior pleading that are absent in a subsequent amended pleading are no longer "live" and thereafter cannot be subject to challenge. *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012); *see, e.g.*, *City of Hidalgo Ambulance Serv. v. Lira*, 17 S.W.3d 300, 304 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) ("The plea addressed a claim of waiver of liability that was no longer in the petition; it was indeed moot."). That did not happen here. Pappas's second amended petition did not any remove claims, it added them. Thus, Pappas's second amended petition did not render the City's first amended plea moot. And the concept of mootness is inapplicable here.

Pappas also claims that we may not consider the City's opposition to the second amended petition because it was first asserted in a reply brief below and now on appeal. It is generally true that arguments raised for the first time on appeal or in a reply brief below may not be considered.[4] But this is different. The City's immunity arguments implicate subject matter jurisdiction, which is never presumed and cannot be waived. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993). And lack of subject matter jurisdiction can be raised for the first time on appeal. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95–96 (Tex. 2012); *see also Dall. Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("[A]n appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all."). As a result, our supreme court has recognized that "an appellate court's review of a plea to the jurisdiction is not limited to the grounds set forth in the governmental unit's plea in the trial court." *Tex. Dep't of Transp. v. Self*, 690 S.W.3d 312, 320–21 (Tex. 2024).

We will therefore address each of the City's immunity arguments raised on appeal.

---

[4] *See McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("An issue raised for the first time in a reply brief is ordinarily waived and need not be considered by this Court.").

**B.      Standard of Review and Applicable Law**

Subject matter jurisdiction is essential to a court's authority to decide a case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000).  Whether a trial court has subject matter jurisdiction is a question of law that we review de novo. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 682 (Tex. 2020) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

Sovereign immunity protects the State and its agencies from lawsuits and liability for money damages and deprives a trial court of subject matter jurisdiction over a plaintiff's claims. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 & n.2 (Tex. 2008).  Governmental immunity offers the same protections for political subdivisions of the State, including municipalities. *Id.*; *see Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 374 (Tex. 2006).

To prevail on an assertion of governmental immunity, the governmental defendant "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018).

When a plea to the jurisdiction challenges the plaintiff's pleadings, we must determine whether the plaintiff has alleged facts that affirmatively demonstrate jurisdiction. *Miranda*, 133 S.W.3d at 226.  Whether the plaintiff has met this burden is also a question of law that we review de novo. *Id.*  Under this review, we construe the pleadings liberally in favor of the plaintiff and consider the pleader's intent. *Id.*

8

Unless the pleadings affirmatively negate the existence of jurisdiction, the plea to the jurisdiction should not be granted without allowing the plaintiff an opportunity to amend. *See id.* at 226–27.

When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues. *Id.* at 227. Our review for this type of challenge mirrors that of a traditional summary judgment motion. *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022). To that end, "all the evidence is reviewed in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019); *see Maspero*, 640 S.W.3d at 528–29 ("[W]e take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor."). If "the pleadings and evidence generate a 'fact question on jurisdiction,' dismissal on a plea to the jurisdiction is improper," and the fact issue must be resolved at trial by the factfinder. *Maspero*, 640 S.W.3d at 529 (citing *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 116 (Tex. 2010) (per curiam)); *Miranda*, 133 S.W.3d at 227–28. "However, 'if the evidence is undisputed or fails to raise a fact question,' the plea must be granted." *Maspero*, 640 S.W.3d at 529 (quoting *Hayes*, 327 S.W.3d at 116); *Miranda*, 133 S.W.3d at 228.

Here, the parties dispute the appropriate standard of review. The City maintains that it challenged the existence of jurisdictional facts, while Pappas contends that the City did not—but rather "argued that the trial court should adopt its view and interpretation of the limited evidence and public documents to make dispositive legal findings on the merits of Pappas's claims." According to Pappas, this is "premature and improper" because a plea to the jurisdiction should be decided without delving into the merits of the case or requiring the plaintiff to put on their case to establish jurisdiction.

Pappas's position overlooks the standards detailed above, i.e., that a plea to the jurisdiction may also challenge the existence of jurisdictional facts. When the plaintiff's "factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction." *Clark*, 544 S.W.3d at 771. This is true even if the evidence implicates both subject matter jurisdiction *and the merits of a claim*. *Id.*

Here, the City's first amended plea to the jurisdiction challenged the existence of jurisdictional facts supporting Pappas's causes of action and included citations to supporting evidence. It was therefore Pappas's burden to raise at least a genuine issue of material fact as to each of the jurisdictional issues raised by the City in order to avoid dismissal. *See Miranda*, 133 S.W.3d at 228 ("[A]fter the [governmental

10

entity] asserts and supports with evidence that the trial court lacks subject matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue.").

With this standard of review in mind, we turn to the City's arguments on appeal.

## C.     Violation of Local Government Code Chapter 252

In Count I of its second amended petition, Pappas alleged that the City failed to comply with the competitive bidding requirements found in Texas Local Government Code Chapter 252 when obtaining the new contract with Areas.[5] The City's failure to comply with these requirements, Pappas asserts, results in a waiver of governmental immunity and entitles Pappas to seek declaratory and injunctive relief.  As support for this relief, Pappas cites to section 252.061(1) of the Local Government Code, which provides:

> If the contract is made without compliance with this chapter, it is void and the performance of the contract, including the payment of any money under the contract, may be enjoined by:

---

[5] The competitive bidding requirements include, among other things, that the RFPs must solicit quotations and specify the relative importance of price and other evaluation factors; that offerors who submit proposals shall be treated fairly and equally with respect to any opportunity for discussion and revision of proposals; and that the contract must be awarded to the lowest responsible bidder or to the bidder who provides goods or services at the best value for the municipality. TEX. LOC. GOV'T CODE §§ 252.042, 252.043(a).

11

(1) any property tax paying resident of the municipality . . . .

Tex. Loc. Gov't Code § 252.061(1).

This right of action created by section 252.061 has been construed by Texas courts as a legislative waiver of immunity. *See, e.g.*, *City of El Paso v. Waterblasting Techs., Inc.*, 491 S.W.3d 890, 897–98 (Tex. App.—El Paso 2016, no pet.); *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 532 (Tex. App.—Austin 2014, no pet.). But the competitive bidding requirements of Chapter 252 apply only to certain contracts. Texas Local Government Code section 252.021 provides in pertinent part as follows:

(a) Before a municipality may enter into a contract that requires an expenditure of more than $50,000 from one or more municipal funds, the municipality must:

(1) comply with the procedure prescribed by this subchapter and Subchapter C for competitive sealed bidding or competitive sealed proposals[.]

Tex. Loc. Gov't Code § 252.021(a)(1).

Thus, the relevant jurisdictional inquiry is whether Chapter 252 applies to the Areas Contract. Stated differently, the question is whether the Areas Contract is a contract that "requires an expenditure of more than $50,000 from one or more municipal funds." *Id.*

The City argues that Chapter 252 does not apply to the Areas Contract because it is a "revenue" contract and requires no expenditure by the City. Pappas disagrees and argues that the Areas Contract will necessarily require the City to spend more

12

than $50,000 on maintenance, personnel, and repurchasing equipment, and that the Areas Contract is a "disguised expenditure contract" covered by Chapter 252. Considering the relevant language of the Areas Contract and statutes at issue, we address these arguments in turn.

In its amended plea, the City argued that city contracts can generally be divided between "expenditure" contracts, "in which the City spends taxpayer dollars to exchange for a good or service to benefit the public," and "revenue" contracts, "in which the City is bringing in money to City coffers." The City characterizes the Areas Contract as a "revenue" contract as opposed to an "expenditure" contract.

The Areas Contract grants Areas the "right, license, and privilege to operate a food and beverage concession in [Hobby]." In exchange for that "right, license, and privilege," Areas agreed to pay the City a monthly percentage fee based on Areas' gross monthly sales of food and beverages. We do not find any provision in the Areas Contract that requires the City to "purchase" any goods or services, and Pappas has not pointed us to any such provision. Rather, Pappas asks us to infer the existence of such language. That we cannot do.[6] We thus agree with the City that the Areas Contract is a revenue generating contract.

---

[6]     *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 770 (Tex. 2018) ("Courts cannot rewrite the parties' contract or add to or subtract from its language.").

But that alone does not preclude the application of Chapter 252. Section 252.021 states that Chapter 252's procedure must be complied with before the City "may enter into a contract that *requires an expenditure* of more than $50,000 . . . ." TEX. LOC. GOV'T CODE § 252.021(a). We still must consider whether this revenue generating contract "requires an expenditure of more than $50,000."

We begin with the provision of the Areas Contract that explicitly states that the contract *does not* require an expenditure by the City. Article 16.27, entitled "No City Expenditure," states that "[n]othing in this Agreement shall be construed to require that the City make any expenditure of its funds by, through[,] or under this Agreement." This provision alone demonstrates that the Areas Contract was not intended to require the City to make an expenditure of $50,000 or more.[7]

To circumvent this language, Pappas points to several other provisions in the Areas Contract that it contends "require[] an expenditure." Pappas argues that (1) Articles 8.1 and 8.2 require the City to expend money on maintenance and utilities; (2) Articles 8.3 and 8.4 require the City to expend money on personnel; and

---

[7] Pappas argues that the City should not be permitted to rely on this provision of the Areas Contract to "contract away its obligations to the citizens of Houston under Texas' competitive bidding statutes." Pappas contends that such a "disclaimer" is contrary to public policy and unenforceable. Even assuming enforcement of this provision violates public policy, a question we do not decide, we conclude that the Areas Contract does not otherwise fall into the ambit of Chapter 252 for the reasons discussed below. The provisions Pappas relies on simply do not "require[] an expenditure of more than $50,000 from one or more municipal funds." *See* TEX. LOC. GOV'T CODE § 252.021(a).

14

(3) Article 14.8 permits the City to expend money repurchasing equipment. But as detailed below, by their plain and express terms, none of these contract provisions require the expenditure of municipal funds. In fact, none of them address expenditures at all.

1. *Maintenance and Utilities*

With respect to maintenance and utilities, Article 8.1.1 states that the "City shall provide and maintain all utilities, including but not limited to heating, ventilation, and air conditioning services and ambient light, to the outer boundary of the footprint of the Facilities." And Article 8.2.1 provides that the City shall "maintain all public areas and facilities such as restrooms, passageways[,] access areas, stairs, escalators, and elevators and shall maintain access to the Facilities."

We first note that Article 8.1.1 also provides that Areas "shall be responsible for the cost of the use of all such [utility] services," as well as "all other utility costs, including but not limited to, deposits, installation costs, connection charges, meter deposits, and all service charges for other utility services . . . ." Thus, we do not construe this provision as requiring any expenditure by the City, when it is clear from the contract that *Areas* is responsible for payment of utilities. *See In re Griffith*, 485 S.W.3d 529, 536 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding) (holding that contracts gave wrecker companies non-exclusive right to provide tows, impose certain requirements on such services, and look solely to owner or operator

15

of vehicle for payment, and, therefore, city presented uncontroverted evidence establishing that contracts did not require any expenditure of municipal funds).

Pappas next contends that, because HAS incurred $318,568,000 in "maintenance and operating" expenses in 2021, these provisions requiring the City to "provide" and "maintain" utilities and public areas necessarily mean that the City will expend monies to meet its maintenance obligations under the Areas Contract.[8] However, as the City points out, the HAS report reflects the maintenance and operating expenses for all three of Houston's airports, not just Hobby. And it does not provide any breakdown of the expenses specific to each individual airport, let alone those specific to certain locations in individual airports.

Without more, we are left to speculate, and stack inference upon inference, as to not only the amount of total maintenance and operating expenses that could be attributed to Hobby, but also as to what portion—if any—of expenses are related to food and beverage concessions at Hobby. This we also cannot do.[9] Because the evidence upon which Pappas relies is so weak as to do no more than create mere

---

[8] HOUS. AIRPORT SYS., BUILD FORWARD BETTER ANNUAL REPORT 2021 90 (2021), https://cdn.fly2houston.com/cdn/ff/C3IUiC0sSoeN9tfrRc9tHEJ6fURa1t0g5wTuyuClDeo /1665602913/public/2022-10/Houston%20Airports%202021%20Annual%20Report.pdf.

[9] *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (explaining that an inference stacked on other inferences is legally insufficient evidence); *Rivas v. City of Hous.*, 17 S.W.3d 23, 28 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("[A] vital fact may not be established by stacking an inference upon an inference.").

surmise and speculation, it fails to create a fact issue on this point. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

### 2. *Personnel*

With respect to personnel, Article 8.3.1 provides:

The Director shall have the right at all reasonable times to enter upon and inspect the Facilities . . . to observe the performance by [Areas] of its obligations hereunder, and to do any act which City may be obligated or have the right to do under this Agreement, the City's Code of Ordinances, or Airport regulations.

Article 8.4.1 states:

[T]he Director or the City Controller may . . . without cost to [Areas], cause an inspection and audit to be made of the books and records . . . and the certified statements and summaries . . . of [Areas] and Subcontractors relating to all operations conducted pursuant to this Agreement.

And Article 8.4.2 states: "The City Attorney or his or her designee shall have the right, after consultation with the Director, to enforce all legal rights and obligations under this Agreement without further authorization."

The City argues that nothing in these paragraphs demonstrates, or even suggests, that the City will be obligated to hire additional personnel, or in any way incur additional expense if any of these actions should ever occur. We agree.

These provisions make no mention of any expenditures that are required to be made by the City—they merely provide for certain actions that various City employees may take. Yet nothing in these provisions requires the City to make a payment to these employees for performing these specific functions.

17

Although Pappas asserted at oral argument that these City employees would not otherwise be employed without this agreement, this argument is not supported by the language of the Areas Contract. The provisions Pappas cites set forth various rights that specific City employees have under the Areas Contract—those employees include the Director, the City Controller, and the City Attorney. These are not City employees whose positions were created by the Areas Contract, nor are these City employees responsible solely for maintaining concessions at Hobby pursuant to the Areas Contract.[10]

Pappas further argues that the City's position fails to consider the concept of "unabsorbed overhead," regarding the "associated wages, salaries, compensation, and other overhead related to individuals performing these actions." But the cases Pappas cites in support of "unabsorbed overhead" discuss it in the context of construction or manufacturing inactivity or delay.[11] Pappas provides no argument

---

[10]  HOUS., TEX., CITY CHARTER art. VII (describing the election, duties, and rights of city controller); HOUS., TEX., CODE OF ORDINANCES ch. 2, div. 1, §§ 2-256–2-264 (creating office of city attorney and describing city attorney's authority, duties, and responsibilities); HOUS., TEX., CODE OF ORDINANCES ch. 9, art. I, §§ 9-3, 9-4 (creating the office of director of Houston Airport System and describing director's duties and responsibilities).

[11]  *See Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 892 (Tex. App.—San Antonio 1996, writ denied) ("'Unabsorbed overhead' includes those expenses, generally in a *manufacturing context*, allocated to a fixed period of production time, that must be absorbed by fewer jobs because a job designated for that given period has been delayed." (emphasis added)); *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed. Cir. 1993) ("Generally, unabsorbed overhead consists of the time sensitive indirect costs incurred *despite construction inactivity*

or explanation as to how that concept would apply to this particular situation, and we decline to make such an argument on its behalf.

More fundamentally, these provisions do not result in the application of section 252.021 because the language of the statute is clear—it only applies to a contract that "requires" an expenditure of more than $50,000. "Require" is defined as "to demand as necessary or essential." *Require*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020).

None of the contract provisions above "demand as necessary or essential" that these employees perform the specific functions, let alone that the City expend money on them for doing so. Rather, these provisions clearly provide that the employees "may" perform these functions or, at most, "have the right" to do so. Nothing in the plain language of these provisions requires the City, the Director, the City Controller, the City Attorney, or anyone else on behalf of the City, to do anything.

### 3. *Purchase of Equipment*

For this same reason, we reject Pappas's contention that Article 14.8 requires the City to expend money on the purchase of equipment. Article 14.8 provides that: "Upon expiration or early termination of this Agreement, the City shall have the

---

*on a project*, such as home office overhead including accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, depreciation." (emphasis added)).

19

right to purchase from [Areas] any or all Removable Fixtures by paying to [Areas] the fair market value of all such items . . . ."

As with the provisions relating to "personnel," this provision merely gives the City "the right to purchase" removable fixtures. But nothing in this provision *requires* the City to do so. And Pappas's reliance on evidence that the City purchased fixtures *from Pappas* <u>after</u> the termination of the Pappas Contract does not create a fact issue as to whether the Areas Contract—an entirely separate contract—requires the City to make an expenditure.

Even viewing the evidence in a light most favorable to Pappas, we conclude that the Areas Contract does not require "an expenditure of more than $50,000 from one or more municipal funds" and that the competitive bidding requirements of Chapter 252 are thus not applicable. Accordingly, we hold that the City did not waive immunity for Count I of Pappas's second amended petition and that the trial court erred in denying the City's amended plea to the jurisdiction on this claim.[12]

---

[12] In doing so, we likewise reject Pappas's argument that the Areas Contract is a disguised expenditure contract. Pappas exclusively cites New Jersey case law applying New Jersey government contracting statutes to support this argument. Pappas, however, does not explain how these New Jersey statutes are comparable to the applicable Texas statutes in Chapter 252. We decline to follow this nonbinding authority from another jurisdiction. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (holding Texas courts are only obligated to follow decisions by higher Texas courts and United States Supreme Court).

We sustain the City's first issue as to Pappas's cause of action for a violation of Chapter 252 of the Texas Local Government Code.

## D.    Breach of Contract

In Counts II and III of its second amended petition, Pappas alleges two causes of action for breach of contract.  In Count II, Pappas alleges that the City, through the RFP, ordinances, and policies, created a unilateral contract in connection with the City's procurement process.  And Pappas alleges that the City breached this unilateral contract when it failed to conduct the solicitation in accordance with the ordinances, policies, and Chapter 252 of the Local Government Code.

In Count III, Pappas alleges that the City breached the Pappas Contract "when it served a written notice of default and claim on 4 Families' Letter of Credit No. 3086469 with Bank of America N.A. on or about May 2, 2023."

According to Pappas, the City waived its immunity for both of these breach-of-contract claims pursuant to section 271.152 of the Texas Local Government Code.  Section 271.152 waives qualifying local governmental entities' immunity from suit for certain breach-of-contract claims, providing:

> A local governmental entity that is authorized by statute or the subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE § 271.152. As described below, this statute waives a governmental entity's immunity from suit for breach of certain written contracts. *City of Hous. v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011).

In order for section 271.152's waiver of immunity to apply, three elements must be established: (1) the party against whom the waiver is asserted must be a "local governmental entity," as defined by section 271.151(3), (2) the entity must be authorized by statute or the Constitution to enter into contracts, and (3) the entity must in fact have entered into a contract that is "subject to this subchapter," as defined by section 271.151(2). TEX. LOC. GOV'T CODE §§ 271.151–.152. A "contract subject to this subchapter" is defined as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2).

The first two elements are met here and not in dispute.[13]

---

[13]    Regarding the first, the waiver of immunity in section 271.152 applies to "local governmental entities," which include municipalities. TEX. LOC. GOV'T CODE § 271.151(3). The City is incorporated as a home-rule city—a type of municipality—and thus is a "local governmental entity" for whom immunity is waived for certain contract suits under section 271.152. *See Williams*, 353 S.W.3d at 135. Concerning the second element, because the City is a chartered home-rule city, it meets section 271.152's requirement that it be "authorized by statute or the constitution to enter into a contract." *See id.* (citing *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) (noting that home-rule cities possess all powers of the state not inconsistent with "the Constitution, the general laws, or the city's charter," except where limited

The only element in dispute with respect to both of Pappas's contract claims is the third element—whether the City entered into a "contract subject to this subchapter." In that regard, section 271.151(2) sets forth five elements that a contract must meet in order for it to be a contract subject to section 271.152's waiver of immunity: (1) the contract must be in writing, (2) state the essential terms of the agreement, (3) provide for goods or services, (4) to the local governmental entity, and (5) be executed on behalf of the local governmental entity. *Id.*

We first address whether the alleged unilateral contract meets these requirements.

### 1. *Breach of Unilateral Procurement Contract*

Pappas alleges that certain ordinances, policies, and the RFP constitute a unilateral contract between the City and "would-be Proposers," including Pappas, that satisfies the five elements above and thereby makes it subject to section 271.152's waiver of immunity. The City disputes this, arguing that, among other things, these ordinances and policies fail to meet the requirement that they contain the essential terms of a legally enforceable agreement. We agree with the City.

"[A] unilateral contract is created when a promisor promises a benefit if a promisee performs." *Williams*, 353 S.W.3d at 135–36; *Vanegas v. Am. Energy*

---

by statute)). Indeed, the City's Charter specifically authorizes it to "contract and be contracted with." HOUS., TEX., CITY CHARTER art. II, § 1.

23

*Servs.*, 302 S.W.3d 299, 303 (Tex. 2009). The requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in "exchange for the promise is something other than a promise," i.e., performance. *Williams*, 353 S.W.3d at 136. A unilateral contract becomes enforceable when the promisee performs. *Id.* (citing *Vanegas*, 302 S.W.3d at 303). As the Supreme Court of Texas has explained, "[a] unilateral contract occurs when there is only one promisor and the other accepts . . . by actual performance," rather than by the usual exchange of mutual promises. *Id.* (quoting *Vanegas*, 302 S.W.3d at 302).

As the crux of the purported unilateral contract, Pappas argues that Ordinance 15-56 contains the following promise by the City: "Procurement professionals and those involved in any procurement in the city shall observe the values and guiding principles globally accepted and promulgated by public procurement professional organizations." HOUS., TEX., CODE OF ORDINANCES ch. 15, art. III, § 15-56 (2024). According to Pappas, further details of this promise include the City's commitment to such "values and guiding principles" as "transparency, impartiality, accountability, professionalism, ethics and service." *Id.*

Pappas also contends that the ordinances direct City personnel to keep this promise and set forth various procurement methods to meet its promise:

- "The CPO [Chief Procurement Officer] shall possess the qualifications and experience necessary to effectively provide leadership on procurement methods and globally accepted public procurement practices." *Id.* § 15-43.

24

- "Whenever practicable, the CPO shall conduct a competitive process for the selection of a vendor associated with contracting opportunities," including requests for proposals. *Id.* § 15-44.

Pappas also points to various administrative policies reflecting this "promise" and detailed terms for fulfilling this promise:

- "[T]he policy of the City of Houston (City) [is] to ensure that all City procurements are conducted in a fair, open, and transparent manner." HOUS., TEX., ADMIN. POLICIES, AP No. 5-7, § 1;

- "For any RFP, an evaluation committee shall be appointed" and "the committee shall be composed of . . . city employees with relevant experience." HOUS., TEX., ADMIN. POLICIES, AP No. 5-10, § 5.2.1;

- "[T]he [evaluation] committee shall evaluate proposals according to the criteria identified in the RFP." *Id.* § 5.2.2; and

- "The committee's recommendation for award shall reflect the consensus of the [evaluation] committee." *Id.* § 5.2.5.

Finally, Pappas asserts that the City reflected its promise to "observe the values and guiding principles" in the procurement process through the RFP, which required that the "evaluation committee shall evaluate Proposers' submissions in accordance with the evaluation criteria listed" in the RFP.

Citing to *City of Houston v. Williams*, Pappas argues that these ordinances, policies, and the RFP resulted in a unilateral contract that became enforceable once Pappas performed by submitting its proposal in response to the RFP. While the supreme court in *Williams* recognized that "in some circumstances, an ordinance or group of ordinances can constitute a unilateral contract," it also noted that most will

25

not as "an ordinance can only be enforced as a contract in a court of law if it satisfies the requirements of a contract." *Williams*, 353 S.W.3d at 136, 143.

In *Williams*, the court addressed whether a lawsuit by 540 former Houston Firefighters against the City of Houston for underpayment of lump-sum severance benefits was barred by governmental immunity. *Id.* at 131–32. The Firefighters relied on section 271.152, arguing that certain City of Houston ordinances and three agreements negotiated between the Firefighters' union and the City constituted written agreements that fell within section 271.152's waiver of immunity. *Id.* In this context, the supreme court considered whether certain City of Houston ordinances constituted a unilateral employment contract. *Id.* at 135–36.

The *Williams* court concluded that "in some circumstances, an ordinance or group of ordinances can constitute a unilateral contract." *Id.* at 136. The court outlined the specific provisions contained in the City of Houston ordinances that constituted the terms of the agreement of the City of Houston to pay certain benefits to its Firefighters, and it concluded that the ordinances in that case comprised a contract. *Id.* at 138–39.

In reaching that conclusion, the court noted that the particular ordinances at issue in *Williams* promised the firefighters "specific compensation in the form of overtime pay and termination pay" in exchange for their performance of the duties expressly set forth in the ordinances. *Id.* at 138. The supreme court then examined

whether the ordinances stated the essential terms of the agreement between the firefighters and the City. *Id.* at 138–39. And it noted, "[i]n the context of employment agreements, typical essential terms include, among others, compensation, duties or responsibilities." *Id.* at 139.

After examining the ordinances, the *Williams* court held that they contained the essential terms of an employment agreement, including (1) defining the "workweek" as the time of performance; (2) setting forth the specific compensation to be paid in defining "regular rate of pay" and "overtime" and in the various termination pay, overtime, holiday, vacation, and leave provisions; and (3) describing the services to be performed. *Id.*

The court discounted the City's concern about the impact of its holding, noting that "most municipal ordinances will not function as contracts within the meaning of section 271.151(2)[] because most will not contain the detailed request for performance and promised compensation found [in the ordinances in question], nor will they be cognizable as an offer to identifiable offerees as these Ordinances are." *Id.* at 143. That is the situation here.

The ordinances, policies, and provisions from the RFP cited by Pappas differ markedly from the ordinances considered by the supreme court in *Williams* because they do not delineate the essential terms of an enforceable agreement.

27

Chapter 271 does not define the phrase "essential terms." *See* TEX. LOC. GOV'T CODE § 271.151(2); *Williams*, 353 S.W.3d at 138. But our case law provides important guidance. An agreement's essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. *See Fischer v. CMTI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Whether particular terms are essential generally depends on the specific contract at issue. *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369 (Tex. 2019).

A contract must state its essential terms with "a reasonable degree of certainty and definiteness" sufficient to confirm that both parties actually intended to be contractually bound and to enable a court to understand and enforce the parties' obligations and provide an appropriate remedy when breached. *Id.* (quoting *Fischer*, 479 S.W.3d at 237). Indeed, the supreme court has instructed that "essential terms" generally include the names of the parties, the property at issue, the basic obligations, the time of performance, the price to be paid, and the service to be rendered. *See Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010).

Here, the provisions cited by Pappas do not promise "in detail specific compensation in return for specified services." *See Williams*, 353 S.W.3d at 143. Unlike the ordinances in *Williams* which described in detail the specific compensation for overtime, holiday, vacation, leave, and on termination, the only

28

"compensation" identified by Pappas is the City's broad "promise" to abide by "values and guiding principles" in the procurement process, such as "transparency, impartiality, accountability, professionalism, ethics and service." HOUS., TEX., CODE OF ORDINANCES ch. 15, art. III, § 15-56 (2024). These provisions are general policy standards that apply globally to *all* procurements involving the City.

Likewise, the provisions are not "cognizable as an offer to identifiable offerees." *Id.* The provisions at issue in *Williams* were addressed to a "discrete group of offerees: those persons qualifying as 'eligible employees,' who are defined as 'all classified members of the fire department.'" But here, under Pappas's interpretation, there is no discrete group of offerees as they could include *any person* who submits a proposal in response to *any RFP* issued by the City. Without identification of the parties to whom the purported contract applies, we cannot conclude that the ordinances, policies, and RFP amount to a contract stating the essential terms with a reasonable degree of certainty and definiteness. *Cf. Kirby Lake Dev., Ltd.*, 320 S.W.3d at 838.[14]

---

[14] *See also Crystal City v. Palacios*, No. 04-11-00381-CV, 2012 WL 1431354, at *4 (Tex. App.—San Antonio Apr. 25, 2012, no pet.) (mem. op.) (distinguishing *Williams* and holding provisions of city charter and personnel manual did not create contract because provisions were global policy statements applicable to all employees and no provision detailed specific compensation to be paid to any employee).

Moreover, as the City points out, the purpose of the RFP process is to solicit competing offers, from which the City would select the best and most advantageous offer.[15] The RFP was a solicitation for bids, and the proposals the City received from vendors in response to the RFP constituted the offer to contract.[16] In that sense, the City's "promise" to abide by "transparency, impartiality, accountability, professionalism, ethics and service" in the procurement process, and to conduct procurements in a "fair, open, and transparent manner," is at best equivalent to a promise to negotiate towards a future contract in good faith.

As the supreme court has held, agreements to negotiate toward a future contract are not legally enforceable, even if the parties agree to negotiate in good faith. *See Vizant*, 576 S.W.3d at 370–71 (holding board's promise to make a good faith effort to authorize higher payment was equivalent to promise to negotiate toward future bargain in good faith that failed to state essential terms of legally enforceable agreement and therefore did not meet requirements under section 272.152 to waive Board's immunity).

---

[15]     *Cf. Urban Elec. Servs., Inc. v. Brownwood Indep. Sch. Dist.*, 852 S.W.2d 676, 677–78 (Tex. App.—Eastland 1993, no writ) ("The school district's advertisement for bids was not an offer, but merely a solicitation for bids.").

[16]     *See id.*; *see also Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 197 (Tex. App.—San Antonio 1999, pet. denied) (tender of bid was offer to contract).

Accordingly, for all these reasons, we conclude that the ordinances, policies, and provisions of the RFP cited by Pappas do not state the essential terms of a legally enforceable agreement. As a result, there is no "contract subject to this subchapter" under section 271.152(2), and Chapter 271 does not waive the City's immunity for Count II of Pappas's second amended petition.

We therefore hold that the trial court erred in denying the City's first amended plea to the jurisdiction on this claim. We sustain the City's first issue as it applies to Pappas's cause of action for breach of a unilateral procurement contract.

## 2. *Breach of the Pappas Contract*

Pappas also alleges that the City breached the Pappas Contract "when it served a written notice of default and claim on 4 Families' Letter of Credit No. 3086469 with Bank of America N.A. on or about May 2, 2023." As with its claim for breach of the unilateral procurement contract, Pappas asserts that section 271.152 waives the City's immunity for this breach-of-contract claim. We therefore must consider whether the Pappas Contract meets the requirements for a "contract subject to this subchapter."

The City challenges only one element of section 271.152(2) with respect to the Pappas Contract—whether the contract "provid[ed] goods or services to the local

governmental entity."[17] TEX. LOC. GOV'T CODE § 271.151(2)(A). According to the City, "the Pappas Contract is another revenue agreement that—like the Concessions Agreement—fails to obligate any expenditure by Houston." Because the Pappas Contract does not require Houston to "pay[] for any good or service," the City argues that it does not fall within the ambit of Chapter 271. We disagree with the City.

Chapter 271 does not define "services." *See Kirby Lake Dev., Ltd.*, 320 S.W.3d at 838–39. Acknowledging this lack of definition, the Supreme Court of Texas has taken a broad view of what the term "services" encompasses, holding that it is "broad enough to encompass a wide array of activities" and "includes generally any act performed for the benefit of another." *Campbellton Rd., Ltd. v. City of San Antonio by & through San Antonio Water Sys.*, 688 S.W.3d 105, 122–23 (Tex. 2024); *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 629 (Tex. 2020). And it has noted that the "only limitation our case law imposes is that the services must provide more than a mere 'indirect, attenuated' benefit." *Campbellton Rd., Ltd.*, 688 S.W.3d at 122–23.

---

[17] Pappas contends that we should not address this argument because the City did not raise it in the trial court and has thus waived it on appeal. As explained above, the issue of governmental immunity implicates subject matter jurisdiction and, therefore, may be raised for the first time on appeal. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95–96 (Tex. 2012). Accordingly, our review is not limited to the grounds set forth in the governmental unit's plea to the jurisdiction in the trial court, and we will consider the argument raised here. *See Tex. Dep't of Transp. v. Self*, 690 S.W.3d 12, 20–21 (Tex. 2024) (citing *Dall. Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013)).

Considering those principles, our supreme court has held that contracts requiring a contractor to perform services that the governmental entity is "otherwise obligated to perform itself" fall within the scope of Chapter 271. For example, in *Kirby Lake*, developers built water and sewer facilities for the Clear Lake Water Authority. 320 S.W.3d at 832–33. Under agreements with the water authority, the developers leased the facilities to the authority, and it agreed to later purchase the facilities if a bond issue was approved. *Id.* The authority could have built the facilities itself, since the Act creating the water authority directed it to develop just such facilities. *See Byrdson Services, LLC v. S. E. Tex. Reg'l Planning Comm'n*, 516 S.W.3d 483, 487 (Tex. 2016) (describing *Kirby Lake*). The Act authorized the water authority to contract with private parties to construct the facilities the authority otherwise would construct itself. *Id.* Although arguably the homeowners were the ultimate beneficiaries of the developers' efforts to build water and sewer facilities, the supreme court in *Kirby Lake* held that the agreements provided sufficiently "concrete" services to the water authority to fall under Chapter 271 because the developers "contracted to construct, develop, lease, and bear all risk of loss or damage to the facilities." *See Kirby Lake*, 320 S.W.3d at 839.

Likewise, in *Byrdson*, under a contract between the State and the Planning Commission, the State provided $95 million to the Commission for various disaster-relief and housing-restoration services following Hurricane Ike. 516 S.W.3d at 484.

33

Under this contract, the Planning Commission committed to provide homeowner-repair services to area households. *Id.* The contract authorized the Planning Commission to subcontract the repair work, and it entered into five contracts with Byrdson Services, LLC. *Id.* The supreme court in *Byrdson* recognized that the homeowners, who were receiving the benefit of the construction services, were arguably the ultimate beneficiaries of the repair contracts. *Id.* at 487. But it held that the benefit to the Planning Commission—satisfying the Commission's contractual obligations to the State—was sufficiently direct and concrete for the contracts to fall within Chapter 271, even if the "primary purpose" of the agreements was to benefit homeowners. *Id.* The same is true here.

The Pappas Contract recites that the City is the owner and operator of Hobby and that the City "has been granted the authority by the State of Texas under Section 22.011 of the Transportation Code to provide for the comfort and accommodation of air travelers."

Section 22.011 of the Transportation Code grants a local government the authority to "plan, establish, construct, improve, equip, maintain, operate, regulate, protect, and police an airport or air navigation facility." TEX. TRANSP. CODE § 22.011(a). That authority includes the power to "construct[], install[], equip[], maintain[], and operat[e] at an airport a building or other facility . . . for . . . the

comfort and accommodation of air travelers, including a facility commonly found and provided at an airport." *Id.* § 22.011(b)(1)(D).

Like the relevant act in *Kirby Lake* and contract in *Byrdson*, this provision also authorized the City to "enter into a contract necessary to the execution of a power granted the local government and for a purpose provided by this chapter." *Id.* § 22.019. In connection with this power to maintain and operate a facility for the comfort and accommodation of air travelers, the City "advertised and received competitive proposals for the right to develop, operate and manage certain designated Facilities at the Airport."

In Article II, the Pappas Contract also recites the City's objectives to, among other things, "provide high quality food and beverage service at the Airport that meets the desires of the traveling public with emphasis on both recognized branded and regional concepts and products" and "provide uninterrupted service to the traveling public during all phases of the on-going renovation and expansion program at the Airport." Pappas agreed "to meet the City's objectives in the delivery of food and beverage services as set forth in Article II." The Pappas Contract also includes an entire section outlining the scope of the services Pappas was to provide pursuant to the contract, as well as a section detailing the various requirements for the provision of "food services and beverage services."

Although air travelers traveling through Hobby may have received the direct benefit of the food and beverage services provided by Pappas pursuant to the Pappas Contract—i.e., the food and beverages themselves—Pappas provision of these services also directly benefited the City by fulfilling the City's statutory role of providing for the "comfort and accommodation of air travelers." *See Byrdson*, 516 S.W.3d at 486; *Kirby Lake*, 320 S.W.3d at 832–33, 839.[18] Thus, this benefit to the City was sufficiently direct and concrete for the contracts to fall within Chapter 271.

Accordingly, we conclude that the Pappas Contract provided goods and services to the City as Chapter 271 requires and, therefore, Chapter 271 waives the City's immunity for suit on Count III of Pappas's second amended petition. *See San Antonio River Auth.*, 601 S.W.3d at 630.

---

[18] *See also Campbellton Rd., Ltd. v. City of San Antonio by & through San Antonio Water Sys.*, 688 S.W.3d 105, 122–23 (Tex. 2024) (holding that contract between developer and San Antonio Water System to fund construction of off-site oversized lift stations and sewer mains according to SAWS's specifications provided sufficiently direct and concrete benefits to SAWS to bring contract with scope of Chapter 271, even if those services to SAWS were not "central purpose of the Contract"); *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 629 (Tex. 2020) ("The contract may primarily require Austin Bridge to provide construction services to the District, but it further requires Austin Bridge to provide services directly for the River Authority, fulfilling the River Authority's management obligations. Even if these services were not the contract's 'primary purpose,' they were neither 'indirect' nor 'attenuated.' Accordingly, we hold that the contract provided goods and services to the River Authority as chapter 271 requires.").

We therefore hold that the trial court did not err in denying the City's amended plea to the jurisdiction on this claim. We overrule the City's first issue as it applies to Pappas's cause of action for breach of the Pappas Contract.

## E. Violation of the Texas Open Meetings Act

In Count IV of its second amended petition, Pappas alleges that the City misrepresented the subject of three consecutive City Council meetings in violation of the Texas Open Meetings Act, specifically section 551.041 of the Texas Government Code. According to Pappas, the City waived its immunity for these claims because the Texas Open Meetings Act provides an express waiver of immunity for claims seeking injunctive relief based on a failure to comply with the Act.

The TOMA is intended to provide public access to and increase public knowledge of government decision making. *Tex. State Bd. of Pub. Accountancy v. Bass*, 366 S.W.3d 751, 759 (Tex. App.—Austin 2012, no pet.). It requires that "[e]very regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter." TEX. LOC. GOV'T CODE § 551.002.

Under the Act, "[a] governmental body shall give written notice of the date, hour, place, and subject of each meeting held by the governmental body." *Id.* § 551.041. Generally, a notice is sufficient under the Act if it informs the reader that "some action" will be considered with regard to the topic. *Lower Colo. River Auth.*

*v. City of San Marcos*, 523 S.W.2d 641, 646 (Tex. 1975). The intended beneficiaries of the Act are not individual citizens, but members of the interested public. *City of San Antonio v. Fourth Ct. of Appeals*, 820 S.W.2d 762, 765 (Tex. 1991). If a reader is given adequate notice of the proposed governmental action, the requirement of the Act is satisfied. *See id.*

Moreover, "[a]n action taken by a governmental body in violation of this chapter is voidable," and "[a]n interested person . . . may bring an action by mandamus or injunction to stop, prevent, or reverse a violation or threatened violation of this chapter by members of a governmental body." TEX. LOC. GOV'T CODE §§ 551.041, .142. "The Open Meetings Act thus contains a clear and unambiguous waiver of immunity from suits seeking injunctive and mandamus relief" for violations of the Act. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 554 (Tex. 2019).

With respect to this claim, Pappas alleges that (1) the City misrepresented whether and to what extent the Hire Houston First Ordinance applies to the RFP, including it in the materials of three successive City Council meeting agendas and then removing it on the eve of voting for the Areas Contract based on purported "error"; (2) the description of the Areas Contract as a ten-year contract is not accurate; and (3) the estimated revenue to the City is based on false and untested

numbers created by HAS personnel. Thus, according to Pappas, the City misrepresented the subject of the City Council meetings, in violation of the TOMA.

The City argues that even if these allegations were true, Pappas has not provided any evidence to support these allegations, or otherwise demonstrated how these constitute violations of the TOMA. Furthermore, the City argues that the agendas for the three City Council meetings, which Pappas attached as evidence to its amended plea, provided sufficient notice to comply with the TOMA.

Those agendas each included the following item: "ORDINANCE approving and authorizing Revenue Agreement between City of Houston and AREAS HOU JV, LLC for Food and Beverage Concession at William P. Hobby Airport (HOU) for the Houston Airport System – 10 Years – Revenue." According to the City, because the contents of the notice are undisputed, "the adequacy of the notice is a question of law." *Burks v. Yarbrough*, 157 S.W.3d 876, 883 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Friends of Canyon Lake, Inc. v. Guadalupe– Blanco River Auth.*, 96 S.W.3d 519, 529 (Tex. App.—Austin 2002, pet. denied)).

We agree with the City. All that the TOMA requires is that the governmental body provide written notice of the date, hour, place, and subject of each meeting. *See* TEX. LOC. GOV'T CODE § 551.041. The subject of the meetings at issue was the approval of the revenue contract between the City and Areas related to food and beverage concessions at Hobby.

Pappas does not allege or present evidence that the agenda items failed to put an interested reader on notice that the City Council would be considering "some action" with respect to, generally, concessions at Hobby, and specifically, the Areas Contract. *See City of San Antonio*, 820 S.W.2d at 765–66; *Lower Colo. River Auth.*, 523 S.W.2d at 646. Pappas's allegations of "misrepresentations" with respect to Hire Houston First and the duration and projected revenue of the Areas Contract—of which Pappas presented no evidence—even if true, do not change the fact that an interested reader was informed of "the topic for consideration," i.e., the Areas Contract. *See Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 958 (Tex. 1986).

We therefore conclude that Pappas has failed to raise a fact question on whether the City violated the TOMA. *See Clark*, 544 S.W.3d at 771; *Miranda*, 133 S.W.3d at 228. Accordingly, we hold that the trial court erred in denying the City's first amended plea to the jurisdiction as to Count IV of Pappas's second amended petition.

We sustain the City's first issue as it applies to Pappas's cause of action for violation of the TOMA.

## F.     Violation of the Equal Protection Clause

In Count V of its second amended petition, Pappas pleaded that the City violated article I, section 3 of the Texas Constitution by conducting the solicitation

for bids in a manner that resulted in the award to Areas. According to Pappas, "the City's actions must be deemed 'void,' to include its ordinance approving and authorizing the Areas Contract, and the Areas Contract itself."

By alleging disparate treatment in conducting the Solicitation, Pappas has alleged a denial of equal rights under the law. *See* TEX. CONST. art. I, § 3 ("All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.").

The Texas Constitution authorizes suits for equitable or injunctive relief for violations of the Texas Bill of Rights. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–49 (1995) (citing TEX. CONST. art. I § 29); *City of Hous. v. Downstream Envtl., L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). But this limited waiver of immunity exists only to the extent that a plaintiff pleads a viable constitutional claim. *Downstream Envtl.*, 444 S.W.3d at 38; *City of Hous. v. Johnson*, 353 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

Texas courts have held that in order to assert a viable equal protection claim under article I, section 3, a claimant must allege that it was treated differently from other similarly situated parties without a reasonable basis. *See Downstream Envtl.*,

444 S.W.3d at 38 (citing *City of Dall. v. Jones*, 331 S.W.3d 781, 787 (Tex. App.—

Dallas 2010, pet. dism'd)).

Because Pappas did not allege its equal protection claim until its second

amended petition, eight days before the trial court's hearing, the City did not assert

its jurisdictional challenge to this claim until just four days before the hearing. Thus,

although the City's arguments challenging Pappas's equal protection claim were

technically raised in the trial court, the timing resulted in Pappas not having a fair

opportunity to address the jurisdictional issues raised by the City's reply through an

amendment or further development of the record. *Cf. Rusk State Hosp.*, 392 S.W.3d

at 96 (recognizing that "a plaintiff may not have had fair opportunity to address

jurisdictional issues by amending its pleadings or developing the record when the

jurisdictional issues were not raised in the trial court").[19]

In this situation, we must construe the pleadings in favor of Pappas, as the

party asserting jurisdiction, to determine if Pappas has alleged a facially valid equal

protection claim. *See id.* ("Under such circumstances appellate courts must construe

---

[19] We note that Pappas filed a motion for continuance on the same day it filed its second amended petition and response to the City's amended plea. In that motion for continuance, Pappas requested that the June 6 hearing be continued so that it could have additional time to conduct expedited jurisdictional discovery.

the pleadings in favor of the party asserting jurisdiction, and, if necessary, review the record for evidence supporting jurisdiction.").[20]

Turning to the allegations in the second amended petition, Pappas alleged that "[d]uring the City Council meeting on March 8, 2023, Houston City Councilmember Mike Knox said that Airport Director Mario Diaz told him that Pappas had been at the airport for 20 years and it was time for 'fresh blood.' This was not a stated evaluation criteria under the RFP." Pappas also alleged that "[a]lthough the RFP assigned the task of evaluating the entire submission to the evaluation committee, HAS evaluated the compensation component through the system provided by a third party."

According to Pappas, before the compensation component was determined, Pappas "was in first place by 2.4 points." HAS then "arbitrarily assign[ed]" compensation scores to Areas and Pappas, resulting in "relative scores that were three points apart . . . without justification[,] [which] directly led to 4 Families receiving a revised total score lower than Areas." After compensation scores calculated by HAS were added, "Areas moved ahead [of Pappas] by 0.6 – a mere fraction of a point." Finally, Pappas alleged that the City, "knowing that [Pappas]

---

[20]   *See also City of Hous. v. Downstream Envtl., L.L.C.*, 444 S.W.3d 24, 38 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (noting that, because City did not raise facial invalidity of plaintiff's equal rights claim in trial court, court would construe plaintiff's pleadings liberally to determine whether they stated a constitutional claim based on unequal application of the law without any reasonable basis).

was slated to obtain the award, . . . effectively created a way to vault Areas over [Pappas]."

Based on these factual allegations, Pappas alleged that the City's "use of the unstated 'fresh blood' evaluation criterion treated [Pappas] differently than similarly situated Proposers." Moreover, Pappas alleged that the City's "treatment of 4 Families was arbitrary, capricious, irrational, and disparate . . . based upon an unequal application of the law without a reasonable basis."

Construing Pappas's pleading liberally, we conclude that its allegations of arbitrary, capricious, irrational, and disparate treatment state a facially viable constitutional claim based upon an unequal application of the law without any reasonable basis. *See Downstream Envtl.*, 444 S.W.3d at 38–39. As such, the equal protection claim alleged in Count V is sufficient to survive a plea to the jurisdiction. We overrule the City's arguments that such claim is facially invalid and hold that the trial court did not err in denying the City's plea to the jurisdiction as to this claim.

We overrule the City's first issue as it applies to Pappas's cause of action for a violation of the equal protection clause of the Texas Constitution.

## G. Uniform Declaratory Judgments Act

In Count VII of its second amended petition, Pappas sought a declaration under the UDJA that "the Ordinance enacted on March 8, 2023 awarding the Areas Contract for Package One to Areas is invalid and void."

The UDJA allows a person whose rights are "affected by a statute [or] municipal ordinance" to "have determined any question of construction or validity arising under the . . . statute [or] ordinance . . . and [to] obtain a declaration of rights, status, or other legal relations thereunder." *See* TEX. CIV. PRAC. & REM. CODE § 37.004(a). As the Texas Supreme Court has recognized, the UDJA does not contain a general waiver of sovereign immunity. *See Swanson*, 590 S.W.3d at 552–53. Rather, it provides only a limited waiver for challenges to the validity of an ordinance or statute. *Id.*

Moreover, the UDJA "does not enlarge the trial court's jurisdiction but is 'merely a procedural device for deciding cases already within the court's jurisdiction.'" *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (quoting *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011)). Accordingly, the underlying action, if against the state or its political subdivisions, must be one for which immunity has expressly been waived. *Id.*

As we held above, the trial court did not err in denying the City's plea to the jurisdiction as to Pappas's claim for a violation of the equal protection clause of the Texas Constitution. In connection with that claim, Pappas requested relief from the trial court in the form of a determination that "the City's actions violated article 1 § 3 of the Texas Constitution, such that the City's Ordinance No. 2023-0154, approving and authorizing the Areas Contract is void."

Texas courts have held that the UDJA may be used to clarify constitutional imperatives. *See City of El Paso v. Bustillos*, 324 S.W.3d 200, 207 (Tex. App.—El Paso 2010, no pet.); *Democracy Coal. v. City of Austin*, 141 S.W.3d 282, 296 (Tex. App.—Austin 2004, no pet.). And the supreme court has held that "suits for equitable remedies for violation of constitutional rights are not prohibited." *Bouillion*, 896 S.W.2d at 149 (drawing distinction between seeking declaration that law is void from seeking compensation for damages and holding that there is no implied right of action for damages for violations of state constitution). Although declaratory judgments are not purely legal or equitable in nature, they are not prohibited by *Bouillion*'s holding that there is no implied right of action for damages under the state constitution. *Democracy Coal.*, 141 S.W.3d at 297 (citing *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970)).

Accordingly, we conclude that relief is proper here under the UDJA based on Pappas's allegations of violations of the equal protection clause of the Texas Constitution. *See Bustillos*, 324 S.W.3d at 207 (holding relief was proper under UDJA based on allegations that city violated plaintiff's due process and equal protection rights).

We hold that the trial court did not err in denying the City's plea to the jurisdiction as to Count VII of Pappas's second amended cause of action. And we

46

overrule the City's first issue as it applies to Pappas's cause of action for a declaratory judgment under the UDJA.

## Conclusion

For all of the reasons above, we reverse the trial court's order denying the City's first amended plea to the jurisdiction as to Pappas's causes of action for violations of Chapter 252 of the Texas Local Government Code (Count I of the second amended petition), for breach of a unilateral procurement contract (Count II of the second amended petition), and for violation of the Texas Open Meetings Act (Count IV of the second amended petition.).  We render judgment dismissing those causes of action.

We affirm the remainder of the trial court's order denying the City's first amended plea to the jurisdiction as to Pappas's causes of action for breach of the Pappas Contract (Count III of the second amended petition), for violations of the Equal Protection Clause (Count V of the second amended petition), and for declaratory relief (Count VI of the second amended petition).  Those causes of action remain before the trial court.


Terry Adams
Chief Justice


Panel consists of Chief Justice Adams and Justices Kelly and Goodman.